# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

SEAN MCGARRY,

       Plaintiff,

vs.                                            No. CIV 16-0483 JB/GJF

BOARD OF COUNTY COMMISSIONERS
FOR THE COUNTY OF LINCOLN, a political
sub-division existing under the law of the
State of New Mexico; LINCOLN COUNTY
SHERIFF'S DEPARTMENT; MIKE WOOD,
individually and as an employee of Lincoln
County Sheriff's Department; JASON GREEN,
individually and as an employee of Lincoln
County Sheriff's Department and DAVID HIGHTOWER,
individually and as an employee of Lincoln
County Sheriff's Department,

       Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Defendants' Motion and Supporting Memorandum for Qualified Immunity and Summary Judgment, filed March 15, 2017 (Doc. 45)("Motion"). The Court held a hearing on November 6, 2017. The primary issues are (i) whether Defendants Mike Wood, Jason Green, and David Hightower (collectively "Officers") are entitled to qualified immunity on Plaintiff Sean McGarry's claim that Wood used excessive force when he shoved McGarry against his kitchen counter to arrest him; (ii) whether the Officers maliciously prosecuted McGarry for resisting, evading, or obstructing a peace officer and for assaulting a peace officer; (iii) whether the Court should dismiss the respondeat superior count against Defendants Board of County Commissioners for the County of Lincoln and the Lincoln County Sheriff's Department; and (iv) whether the Court should dismiss the remaining

state law claims.  The Court concludes that: (i) Wood used excessive force, but he is entitled to qualified immunity, because the right was not clearly established; (ii) the Officers are entitled to qualified immunity on the malicious prosecution count, because the right was not clearly established; (iii) Lincoln County and Lincoln County's Sheriff's Department cannot be liable under respondeat superior for 42 U.S.C. § 1983 claims; and (iv) the Court declines to exercise supplemental jurisdiction over McGarry's remaining state law claim, so dismisses it. Accordingly, the Court grants the Motion for all federal claims and dismisses the state law claim without prejudice.

## FACTUAL BACKGROUND

The Court draws its facts from the Defendants' statement of undisputed material facts. See Motion at 3-5.  See also Plaintiff's Response and Supporting Memorandum to Defendant's Motion for Qualified Immunity and Summary Judgment at 1-3, filed April 24, 2017 (Doc. 52)("Response").[1]

On May 26, 2014, Officers Wood, Green, and Hightower responded to a report that McGarry and his girlfriend -- Theresa Traci -- got into a fight at McGarry's rural New Mexico home.  See Motion ¶ 1, at 3 (asserting this fact)(citing Affidavit of Deputy Mike Wood ¶ 3, at 1 (executed March 14, 2017), filed March 15, 2017, (Doc. 45-1)("Wood Aff."); Lapel Video of Deputy Mike Wood at 0:00:00-0:20:47, (dated May 26, 2014), filed March 15, 2017 (Doc. 45-

---

[1]The Court notes that the Response does not contain "a concise statement of the material facts cited by the movant as to which the non-movant contends a genuine issue does exist." D.N.M.L.R.-Civ. 56.1(b).  The Response also does not number "[e]ach fact in dispute," "refer with particularity to those portions of the record upon which the non-movant relies," nor "state the number of the movant's fact that is disputed."  D.N.M.L.R.-Civ. 56.1(b).  Under the D.N.M.L.R. 56(b), failure to comply with the local rules can result in the facts being deemed undisputed.  McGarry conceded at the hearing that he does not dispute any of the Defendants' facts.  See Draft Transcript of Motion Proceedings Tr. 20:12-20 (Court, Witt).  Accordingly, the Court draws its facts from the Motion.

1)(Attachment 1)("Wood Video 1").  McGarry is a suspended police officer whom the Capitan New Mexico Police Department employed.  <u>See</u> Motion ¶ 5, at 3 (asserting this fact)(citing Wood Aff. ¶ 7, at 1; Wood Video 1 at 0:05:03-11, 0:13:12-0:14:42).

When the Officers arrived at McGarry's home, Wood approached Traci, who was outside of the residence, while Green and Hightower ventured into the home to speak with McGarry. <u>See</u> Motion ¶¶ 2-3, at 3 (asserting this fact)(citing Wood Aff. ¶¶ 3-5, at 1; Wood Video 1 at 0:00:00-0:20:47).  Traci told Wood that McGarry had choked her the previous night and that she had returned to McGarry's home to retrieve her belongings and her pet lizard.  <u>See</u> Motion ¶¶ 4, 6, at 3 (asserting this fact)(citing Wood Aff. ¶¶ 6, 8, at 1-2; Wood Video 1 at 0:00:25-0:02:18, 0:03:20-45; Lapel Video of Deputy Mike Wood at 0:01:40-0:10:40, (dated May 26, 2014), filed March 15, 2017 (Doc. 45-1)(Attachment 2)("Wood Video 2")).  Traci also told Wood that she was afraid of McGarry.  <u>See</u> Motion ¶ 6, at 3 (citing Wood Aff. ¶ 8, at 2; Wood Video 1 at 0:00:25-0:02:18, 0:03:20-45; Wood Video 2 at 0:01:40-0:10:40)).

Approximately thirty minutes after the Officers arrived at the home, and while Wood was helping Traci work through some paperwork, McGarry exited his house while talking on the phone and told the person with whom he was speaking that Traci was lying and "playing the female card."  Motion ¶ 8, at 4 (asserting this fact)(citing Wood Aff. ¶ 9, at 2; Wood Video 2 at 0:10:37-43).  Wood, seeing that McGarry's conversation upset Traci, ordered McGarry to go back inside or face arrest.  <u>See</u> Motion ¶ 9, at 4 (asserting this fact)(citing Wood Aff. ¶ 10, at 2; Wood Video 2 at 0:10:44-0:11:15).  McGarry became agitated, but retreated into his home.  <u>See</u> Motion ¶ 10, at 4 (asserting this fact)(citing Wood Aff. ¶ 11, at 2; Wood Video 2 at 0:10:44-0:11:15).

Green followed McGarry into the house and pleaded with McGarry, who was yelling,[2] to be calm. See Lapel Video of Deputy Jason Green at 35:20-43, (dated May 26, 2014), filed March 15, 2017 (Doc. 45-1)(Attachment 3)("Green Video"); Response at 1-3 (not disputing this fact).[3] McGarry continued to yell and moved to enter another room, upon which Green said to him, "I can't have you walk in there. You've already advised me you have a gun in the house."[4] Green Video at 35:44-47 (Green). See Motion at 3-5 (not disputing this fact). In response, McGarry yelled at Green: "You want the fucking gun?" Green Video at 35:47-48 (McGarry). See Motion at 3-5 (not disputing this fact); Response at 1-3 (not disputing this fact). McGarry moved to the kitchen, picked up a box underneath the kitchen counter and shouted: "It's right here. . . . It's in the fucking box, and you're pointing a gun at me. . . . Get the fuck out of my house!" Green Video at 35:49-36:04 (McGarry). See Motion at 3-5 (not disputing this fact);

---

[2]McGarry contends that he spoke "in a loud voice" throughout his interaction with the Officers, because "he had not yet installed his hearing aid" that day. Response at 2. McGarry does not cite the record for this assertion, nor does the record that the Defendants provided support it. See Wood. Aff. ¶ 1-24, at 1-3; Green Video at 35:34-36. For example, there are times when McGarry speaks in a regular register, see Green Video at 35:34-36, and there are also times when McGarry's facial expression, while screaming profanities, is consistent with anger or rage, see Green Video at 36:02-36:13 (McGarry)("Get the fuck out of my house!"). Because McGarry's fact lacks evidentiary support and the available record contradicts McGarry's assertion, the Court will not consider McGarry's factual assertion for why he was speaking loudly. See Fed. R. Civ. P. 56(e)(4).

[3]The parties do not assert or cite this fact, but the Court is not limited to just the facts that the parties raise. See Fed. R. Civ. P. 56(c) ("The court need consider only the cited materials, but it may consider other materials in the record."). Because the record supports this fact and because the parties do not dispute it, the Court will consider it.

[4]McGarry asserts, without support, that Green entered the home "and yelled 'where's the gun at?'" Response at 2. The record does not support this assertion, so the Court will not consider it. See Fed. R. Civ. P. 56(e)(4).

Response at 1-3 (not disputing this fact).[5]  During this exchange, Green had drawn his duty firearm, but holstered it seconds after seeing the box.  See Green Video at 35:49-36:04; Lapel Video of Deputy David Hightower at 0:048:08-15, (dated May 26, 2014), filed March 15, 2017 (Doc. 45-1)(Attachment 4)("Hightower Video")).  See Motion at 3-5 (not disputing this fact); Response 1-3 (not disputing this fact).  As McGarry yelled at Green to leave his house, McGarry alternated between pointing his finger at Green and at the door.  See Green Video at 35:54-36:15.

Wood, who was still outside the home, heard screaming, so he ran inside  See Motion ¶ 12, at 4 (asserting this fact)(citing Wood Aff. ¶ 13, at 2; Wood Video 2 at 0:11:40-53).  Wood was afraid that Green and Hightower were in danger, because he knew McGarry had a gun.  See Motion ¶ 12, at 4 (asserting this fact)(citing Wood Aff. ¶ 13, at 2; Wood Video 2 at 0:11:40-53).  Wood had been told, however, that the gun was old and that there was no ammunition for it.  See Wood Video at 13:10-21 (Traci).  As Wood entered the kitchen, he saw McGarry standing a few feet from Green yelling and shaking his finger.  See Motion ¶ 13, at 4 (citing Wood Aff. ¶ 14, at 2; Wood Video 2 at 0:11:53-0:13:19; Green Video at 0:35:57-0:37:25; Hightower Video at 0:048:20-0:50:00).  Believing that McGarry was about to hit Green, Wood grabbed McGarry from behind in a bear hug, pushed McGarry against the kitchen counter, and, later, forced him to the ground.  See Motion ¶ 15, at 4-5 (asserting this fact)(citing Wood Aff. ¶ 16, at 2; Wood Video 2 at 0:11:53-0:13:19; Green Video at 0:35:57-0:37:25; Hightower Video at 0:48:20-0:50:00); Response at 3 (not disputing this fact).  When McGarry stopped struggling, Wood then handcuffed him.  See  Motion ¶ 15, at 4-5 (asserting this fact)(citing Wood Aff. ¶ 16, at 2; Wood

_____

[5]According to McGarry, Green pointed his gun at McGarry and yelled at him to "drop the weapon!" Response at 2.  The record -- specifically the Green Video -- does not support this assertion, so the Court will not consider it, and will consider the fact it recounts in the text as undisputed.  See Fed. R. Civ. P. 56(e)(4).

Video 2 at 0:11:53-0:13:19; Green Video at 0:35:57-0:37:25; Hightower Video at 0:48:20-0:50:00); Response at 3 (not disputing this fact).

After arresting McGarry, Wood filed a Criminal Complaint against McGarry for assaulting a peace officer and resisting, evading, or obstructing an officer.  See Criminal Complaint at 1, filed March 15, 2017 (Doc. 45-1)("Criminal Complaint").  On November 16, 2015, a jury acquitted McGarry on both counts.  See Response at 3.

## PROCEDURAL BACKGROUND

McGarry subsequently filed a Complaint for Civil Rights Violations, filed May 26, 2016, (Doc. 1)("Complaint"), which alleges an excessive force claim against Wood, a malicious prosecution claim against the Officers, a respondeat superior claim against Lincoln County and the Lincoln County Sheriff's Department for the Officers' acts, and a New Mexico Tort Claims Act ("NMTCA"), N.M. Stat. Ann. § 41-4-1 to 30, claim against the Officers.  See Complaint ¶¶ 43-72, at 5-8.

### 1.    **The Motion.**

On March 15, 2017, the Defendants filed the Motion.  See Motion at 1.  The Defendants argue, as an initial matter, that Green and Hightower are not liable under the NMTCA and for malicious prosecution, because there is no evidence that those officers caused the purported harm.  See Motion at 6 n.1 (citing Pahls v. Thomas, 718 F.3d 1210, 1231 (10th Cir. 2013)).[6]  The Defendants also argue that the claim against the Lincoln County Sheriff's Department fails, because it is a subdivision of Lincoln County.  See Motion at 6 n.1 (citing Hunter v. Luna Cty. Detention Ctr., No. 11-0954 (D.N.M. September 6, 2012)(Doc. 84)(Vidmar, M.J.)).  They also

_____

[6]They add, however, that, could McGarry demonstrate causation, the claims would still fail against Green and Hightower for the same reasons that they fail against Wood.  See Motion at 6 n.1.

contend that Lincoln County and the Lincoln County Sheriff's Department cannot be liable on any of the individual claims, because they are not individuals capable of causing the constitutional and tort harms alleged.  See Motion at 6, n.1.

The Defendants also argue that Wood did not clearly commit a violation under the Fourth Amendment of the Constitution of the United States of America when Wood pushed McGarry into the kitchen counter and handcuffed him on the ground.  See Motion at 7.  They contend that, under the totality of the circumstances, it was reasonable for Wood to take those actions when he observed McGarry screaming profanities and shaking his finger at Green.  See Motion at 7-8.  According to the Defendants, Wood's actions were all the more reasonable, because Wood knew that McGarry had battered his girlfriend the prior night, McGarry had a temper, and McGarry had a gun in the home.  See Motion at 8.  The Defendants conclude that, in light of those facts, and the minimal force that Wood used against McGarry, Wood's actions did not violate the Fourth Amendment.  See Motion at 8.

The Defendants aver that there is no United States Court of Appeals for the Tenth Circuit case that has held that a similar use of force -- "taking hold of a suspect, forcing him against a counter, and placing him on the ground to cuff him" -- violates the Fourth Amendment.  Motion at 11.  They also aver that the Tenth Circuit has held that more force than Wood used was not excessive.  See Motion at 11-14 (citing Aldaba v. Pickens, 844 F.3d 870, 879 (10th Cir. 2016)).

The Defendants also contend that Wood did not maliciously prosecute McGarry.  See Motion at 14.  The Defendants assert that Wood had probable cause to arrest McGarry for assaulting Green, or resisting, evading, or obstructing Wood, so the malicious prosecution claim fails.  See Motion at 14-15.  The Defendants contend that Wood had probable cause to arrest for assault when he observed McGarry yelling profanities at Green and waving his hand in Green's

face.  See Motion at 15-16 (citing Benavidez v. Shutiva, 2015-NMCA-065, ¶¶ 13-14, 350 P.3d 1234, 1241-42).  The Defendants argue that Wood had probable cause to arrest McGarry for resisting, evading, or obstructing an officer, because: (i) McGarry's yelling caused Wood to stop his "investigation" in order to assist Hightower and Wood; (ii) McGarry refused repeated orders from officers to calm down; and (iii) McGarry hurled profanities at the Officers.  See Motion at 18.  The Defendants also argue that no case exists which demonstrates Wood's actions clearly amount to malicious prosecution.  See Motion 19-21.

The Defendants argue that McGarry's respondeat superior claim fails against Lincoln County, because "*respondeat superior* is not available in Section 1983 cases."  Motion at 21. They also contend that, to the extent the respondeat superior claim relates to the NMTCA, it fails, because McGarry cannot show that any of the Officers committed any torts.  See Motion at 21.  Finally, they contend that the NMTCA claim fails, because Wood's actions, under the totality of the circumstances, were reasonable.  See Motion at 22.

> **2.**     **The Response**.

McGarry responds that Wood did not have probable cause to arrest McGarry.  See Response at 5.  He contends that McGarry's yelling and gesturing would not lead a reasonable officer to believe that McGarry was "resisting, evading, or obstructing a police officer." Response at 6-7.  He also contends that Green's and Hightower's presence in the room with McGarry makes Wood's action less reasonable.  See Response at 7.  McGarry argues that the gun he owned was an antique and never left the box, so Wood could not have been responding to a danger that the gun presented.  See Response at 7.

McGarry also contends that Wood used excessive force.  See Response at 7-9.  He argues that, under the Graham v. Connor, 490 U.S. 386, 396 (1989)("Graham") factors, Wood used

excessive force, because: (i) McGarry was not committing a crime; (ii) McGarry's only actions were yelling and waving at Green; and (iii) McGarry was not resisting arrest. <u>See</u> Response at 8. McGarry also argues that Wood caused the situation, because he ordered McGarry back into the home. <u>See</u> Response at 9. According to McGarry, because Wood caused McGarry to re-enter the home, Wood is more likely to have used excessive force. <u>See</u> Response at 9 (citing <u>Servier v. Lawrence</u>, 60 F.3d 695, 699 (10th Cir. 1995)).

### 3. **Reply.**

The Defendants argue that, because McGarry does not mention Green or Hightower in his Response, summary judgment is appropriate for them. <u>See</u> Reply at 2 n.1. They also contend that, because McGarry makes no argument on the respondeat superior and the NMTCA claims, summary judgment is appropriate on those claims. <u>See</u> Reply at 3 (citing D.N.M.L.R.-Civ. 7.1). They add that McGarry has not followed the summary judgment rules, because he relied on his pleading in the Response. <u>See</u> Reply at 3.

The Defendants then reiterate their arguments from the Motion. <u>See</u> Reply at 4-11. They also argue that, because McGarry "fail[s] to point to the record" to establish excessive force or malicious prosecution, "the Court must enter Summary Judgment." Reply at 6 (citing <u>Margheim v. Buljko</u>, 855 F.3d 1077, 1087 (10th Cir. 2017)). They also argue that McGarry fails to rebut the Defendants' arguments on malicious prosecution, because, according to the Defendants, McGarry must not only negate probable cause for the crime charged, but for "<u>any</u> offense." Reply at 7 (emphasis in original). They continue that, because McGarry argued only that he did not resist, obstruct, or evade Wood, his malicious prosecution claim must fail. <u>See</u> Reply at 7.

The Defendants also argue, again, that McGarry has pointed to no published Supreme Court of the United States of America or Tenth Circuit case, which establishes that Wood

violated McGarry's clearly established rights.  See Reply at 9-10.  They contend that the cases

McGarry cite actually support that there was no constitutional violation.  See Reply at 9-10

(Cortez v. McCauley, 478 F.3d 1108, 1128 (10th Cir. 2007); Servier v. City of Lawrence, 60

F.3d at 700).  Finally, they argue that McGarry presented only a state case on the malicious

prosecution claim, so failed to meet his burden under qualified immunity's second prong.  See

Reply at 10-11.  The Defendants conclude that the Court should dismiss all of McGarry's claims.

See Reply at 11.

### 4. The Hearing.

The Court held a hearing.  See Draft Transcript of Motion Proceedings (taken November

6, 2017)("Tr.").[7]  The Court opened by noting that, on qualified immunity's clearly established

prong:

> The Tenth Circuit is getting reversed [i]n per cur[iam] opinions. . . .  It doesn't
> seem . . . that you can really satisfy the Supreme Court right now on this clearly
> established pro[ng], you know it's just such a difficult thing to satisfy the
> Supreme Court.  They say they're not requiring a case on point, but the reality is I
> think they're getting very close to that and that's just difficult to do in these cases.
> . . .  [T]hat's not what I think the law should be.  And I think they're pretty much
> making 1983 a pretty difficult area for us to develop constitutional law in.  So I'm
> sympathetic to what the plaintiffs are saying about clearly established . . . [but] I
> think this one may be one of those where it's very difficult for the plaintiff to
> point to a clearly established law.

Tr. at 2:12-3:8 (Court).  The Court also noted that the facts are undisputed.  See Tr. at 4:2-5

(Court).

The Defendants agreed with the Court's characterization of the clearly established prong.

See Tr. at 4:19-23 (Martinez)("[W]hen you look at the facts, there just isn't an obvious case that

would have put deputy Woods on notice that [Wood's] action . . . would violate the plaintiff, Mr.

---

[7]The Court's citations to the hearing transcript refer to the court reporter's original,
unedited version.  Any final transcript may contain slightly different page and/or line numbers.

McGarry's Fourth Amendment right."). The Court, however, turned the Defendants to the facts and noted that the situation gave it pause

> in the sense that Wood comes in and sees . . . somebody yelling . . . he doesn't see . . . any violence yet. . . . [P]olice officers have to be prepared for people cursing at them and yelling at them. And people have a First Amendment right in this country to do those sort of things. Can they then just turn around and start slamming people to the floor?

Tr. at 5:3-11 (Court). The Defendants rejoined that the proper inquiry is to look at the facts with "the lens of what Deputy Wood knew at the time and just prior to entering the house." Tr. at 5:14-16 (Martinez). The Defendants argued that the facts demonstrate that Wood knew: (i) McGarry had choked his girlfriend the prior night; (ii) McGarry had a weapon in the house; and (iii) McGarry was within a foot and a half of Green screaming profanities. See Tr. at 5:17-25 (Martinez). The Court asked whether there is any case "in which the police officer has been allowed to use physical force when there has been no contact or violence, [or] weapon shown." Tr. at 7:8-11 (Court). The Defendants could point to no analogous cases where qualified immunity was granted on whether the right was violated, but argued that there are cases suggesting the right is not clearly established. See Tr. at 7:14-8:11 (Martinez)(citing Aldaba v. Pickens, 844 F.3d at 879). The Defendants argued, however, that there was no excessive force, because

> [w]hat Wood did is he wrapped his arms around Mr. McGarry in an effort to calm the situation down. And as he went to wrap his arms, well Mr. McGarry then, the video will show appears to push off the officer, appears to resist, and that's really at that point where Mr. McGarry gets pushed into the counter and then onto the floor.

Tr. at 9:11-18 (Martinez). It added that a similar situation occurred in Gallegos v. City of Colorado Springs, 114 F.3d 1024, 1026 (10th Cir. 1997), where an officer "took down a suspect believing the suspect would strike another officer." Tr. at 10:4-7 (Martinez). The Defendants

then retreated from its briefing position that summary judgment was automatically required, because McGarry had not cited to a record or introduced facts: "[T]he Court would still have to establish that there is no genuine issue of fact as to the underlying claim being brought." Tr. at 14:10-12 (Martinez).

McGarry rejoined that the facts demonstrate excessive force, because McGarry had long ago been separated from Traci, and the two other officers in the room -- Green and Hightower -- "were two armed Lincoln County deputies." Tr. at 17:12-13 (Witt). See id. at 16:13-18:8 (Witt). McGarry conceded, however, that his respondeat superior claim fails and that the Court should dismiss his state claims if it grants summary judgment on his federal claims. See Tr. at 18:11-13 (Witt); id. at 21:9-11 (Witt). McGarry also conceded that, "[w]ith regard to the clearly established [inquiry], I agree with the Court that I certainly could not find any cases that were directly on point." Tr. at 19:21-24 (Witt).

Returning to the excessive force claim, McGarry argued that he was not violent in the kitchen and that he did not draw a weapon. See Tr. at 19:14-16 (Witt). He also argued that yelling and shaking a finger at an officer's face is not enough to establish probable cause for resisting, evading, or obstructing an officer. See Tr. at 24:5-10 (Witt). He added that those actions do not make it reasonable for Wood to "tackle[]" McGarry. Tr. at 25:5-7 (Witt).

The Defendants countered that officers "don't have to wait [for the] glint of steel before taking action." Tr. at 25:22-23 (Martinez). It follows, according to the Defendants, that Wood did not have to wait for McGarry to punch Green for Wood to reasonably grab McGarry and force him to the ground. See Tr. at 26:3-7 (Martinez). The Court asked "isn't it a fairly strong inference that no force was necessary if [] the two police officers inside the house that had been there for some time weren't using it." Tr. at 27:7-10 (Court). The Defendants rejoined that the

other officers' failure to act "isn't a factor that we need to look at," because the relevant inquiry is what Wood knew at the time. Tr. at 27:19-28:2 (Martinez)(citing White v. Pauly, 137 S. Ct. 548, 551-52 (2017)). The Court concluded by signaling its inclination that it would grant the motion on qualified immunity's clearly established prong, but that it would decide the constitutional prong, and that it needed to give that prong some thought. See Tr. at 30:7-31:14 (Court).

## LAW REGARDING SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'" Herrera v. Santa Fe Pub. Sch., 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013) (Browning, J.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d at 891). See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial." Celotex Corp. v. Catrett, 477 U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[8]

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries

---

[8]Although the Honorable William J. Brennan, Jr., Associate Justice of the Supreme Court of the United States, dissented in Celotex Corp. v. Catrett, this sentence is widely understood to be an accurate statement of the law. See 10A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990). See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993) ("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."). Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings." Anderson v. Liberty Lobby, Inc., 477 U.S. at 256. See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("However, once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.")(citation omitted). Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. Co. v. Omer, 2008 U.S. Dist. LEXIS 45838, at *1 (D. Kan. 2008)(Robinson, J.)(citing Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006); Fed. R. Civ. P. 56(e)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 250. A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Anderson v.

Liberty Lobby, Inc., 477 U.S. at 248). Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539. "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (citations omitted).

When reviewing a motion for summary judgment, the court should keep in mind certain principles. First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249. Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability." Anderson v. Liberty Lobby, Inc., 477 U.S. at 254. Third, the court must resolve all reasonable inferences and doubts in the nonmoving party's favor, and construe all evidence in the light most favorable to the nonmoving party. See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Anderson v. Liberty Lobby, Inc., 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."). Fourth, the court cannot decide credibility issues. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's version of the facts. This doctrine developed most robustly in the qualified immunity arena. In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court of the United States of America concluded that summary judgment was appropriate where video evidence "quite clearly

contradicted" the plaintiff's version of the facts.  550 U.S. at 378-81.  The Supreme Court

explained:

> At the summary judgment stage, facts must be viewed in the light most favorable
> to the nonmoving party only if there is a "genuine" dispute as to those facts.  Fed.
> Rule Civ. Proc. 56(c).  As we have emphasized, "[w]hen the moving party has
> carried its burden under Rule 56(c), its opponent must do more than simply show
> that there is some metaphysical doubt as to the material facts . . . .  Where the
> record taken as a whole could not lead a rational trier of fact to find for the
> nonmoving party, there is no 'genuine issue for trial.'"  Matsushita Elec.
> Industrial Co. v. Zenith Radio Corp., 475 U.S. [at] 586-587 . . . (footnote
> omitted).  "[T]he mere existence of *some* alleged factual dispute between the
> parties will not defeat an otherwise properly supported motion for summary
> judgment; the requirement is that there be no *genuine* issue of *material* fact."
> Anderson v. Liberty Lobby, Inc., 477 U.S. [at] 247-248 . . . .  When opposing
> parties tell two different stories, one of which is blatantly contradicted by the
> record, so that no reasonable jury could believe it, a court should not adopt that
> version of the facts for purposes of ruling on a motion for summary judgment.

Scott v. Harris, 550 U.S. at 380 (emphases in original).  Applying these standards to a factual

dispute over whether the plaintiff-respondent "was driving in such fashion as to endanger human

life," the Supreme Court held that the plaintiff-respondent's "version of events is so utterly

discredited by the record that no reasonable jury could have believed him."  550 U.S. at 380.

Thus, the Supreme Court concluded, "[t]he Court of Appeals should not have relied on such

visible fiction; it should have viewed the facts in the light depicted by [a] videotape," which

showed the plaintiff-respondent driving extremely dangerously.  550 U.S. at 381.

The United States Court of Appeals for the Tenth Circuit applied this doctrine in

Thomson v. Salt Lake County, 584 F.3d 1304 (10th Cir. 2009), and explained:

> [B]ecause at summary judgment we are beyond the pleading phase of the
> litigation, a plaintiff's version of the facts must find support in the record: more
> specifically, "[a]s with any motion for summary judgment, when opposing parties
> tell two different stories, one of which is blatantly contradicted by the record, so
> that no reasonable jury could believe it, a court should not adopt that version of
> the facts."  York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir.
> 2008)(quoting Scott, 550 U.S. at 380); see also Estate of Larsen ex rel. Sturdivan

- 16 -

v. Murr, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cty., 584 F.3d at 1312 (brackets omitted). "The Tenth Circuit, in Rhoads v. Miller, [352 F. App'x 289 (10th Cir. 2009)(Tymkovich, J.)(unpublished),][9] explained that the blatant contradictions of the record must be supported by more than other witnesses' testimony[.]" Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)(Browning, J.)(citation omitted), aff'd, 499 F. App'x 771 (2012).

> In evaluating a motion for summary judgment based on qualified immunity, we take the facts "in the light most favorable to the party asserting the injury." Scott v. Harris, 550 U.S. 372, 377 (2007). "[T]his usually means adopting . . . the plaintiff's version of the facts," id. at 378, unless that version "is so utterly discredited by the record that no reasonable jury could have believed him," id. at 380. In Scott, the plaintiff's testimony was discredited by a videotape that completely contradicted his version of the events. 550 U.S. at 379. Here, there is no videotape or similar evidence in the record to blatantly contradict Mr. Rhoads' testimony. There is only other witnesses' testimony to oppose his version of the facts, and our judicial system leaves credibility determinations to the jury. And given the undisputed fact of injury, Mr. Rhoads' alcoholism and memory problems go to the weight of his testimony, not its admissibility . . . . Mr. Rhoads alleges that his injuries resulted from a beating rendered without resistance or provocation. If believed by the jury, the events he describes are sufficient to support a claim of violation of clearly established law under Graham v. Connor, 490 U.S. 386, 395-96 (1989), and this court's precedent.

Rhoads v. Miller, 352 F. App'x at 291-92. See Lymon v. Aramark Corp., 728 F. Supp. 2d at 1249-50 (quoting Rhoads v. Miller, 352 F. App'x at 291-92). In a concurring opinion in

---

[9]Rhoads v. Miller is an unpublished Tenth Circuit opinion, but the Court can rely on an unpublished Tenth Circuit opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished opinions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated: "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored. . . . However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision." United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court concludes that Rhoads v. Miller, Lobozzo v. Colo. Dep't of Corr., Painter v. City of Albuquerque, Youbyoung Park v. Gaitan, White v. Martin, and Clema v. Colombe have persuasive value with respect to a material issue, and will assist the Court in its preparation of this Memorandum Opinion and Order.

Thomson v. Salt Lake County, the Honorable Jerome A. Holmes, United States Circuit Judge for the Tenth Circuit, stated that courts must focus first on the legal question of qualified immunity and "determine whether plaintiff's factual allegations are sufficiently grounded in the record such that they may permissibly comprise the universe of facts that will serve as the foundation for answering the legal question before the court," before inquiring into whether there are genuine issues of material fact for resolution by the jury. 584 F.3d at 1326-27 (Holmes, J., concurring)(citing Goddard v. Urrea, 847 F.2d 765, 770 (11th Cir. 1988)(Johnson, J., dissenting))(observing that, even if factual disputes exist, "these disputes are irrelevant to the qualified immunity analysis because that analysis assumes the validity of the plaintiffs' facts").

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982). "Qualified immunity protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'" Roybal v. City of Albuquerque, No. 08-0181, 2009 WL 1329834, at *10 (D.N.M. April 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)). The Supreme Court deems it "untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials." Butz v. Economou, 438 U.S. 478, 504 (1978). See Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 392 (1971)("Bivens"). "The qualified immunity analysis is the same whether the claims are brought under Bivens or pursuant to the post-Civil War Civil Rights Acts." Breidenbach v. Bolish, 126 F.3d 1288, 1291 (10th Cir.

1997), <u>overruled on other grounds as recognized by</u> <u>Currier v. Doran</u>, 242 F.3d 905 (10th Cir. 2001).

Under § 1983 -- invoked in this case -- and <u>Bivens</u>, a plaintiff may seek money damages from government officials who have violated his or her constitutional or statutory rights. To ensure, however, that fear of liability will not "unduly inhibit officials in the discharge of their duties," <u>Anderson v. Creighton</u>, 483 U.S. 635, 638 (1987), the officials may claim qualified immunity; so long as they have not violated a "clearly established" right, the officials are shielded from personal liability, <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982).

> That means a court can often avoid ruling on the plaintiff's claim that a particular right exists. If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages. The court need never decide whether the plaintiff's claim, even though novel or otherwise unsettled, in fact has merit.

<u>Camreta v. Greene</u>, 563 U.S. 692, 705 (2011).

Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Pearson v. Callahan</u>, 555 U.S. at 231 (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. at 818). Qualified immunity also shields officers who have "reasonable, but mistaken beliefs," and operates to protect officers from the sometimes "hazy border[s]" of the law. <u>Saucier v. Katz</u>, 533 U.S. 194, 205 (2001). When a defendant asserts qualified immunity, the plaintiff must demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct. <u>See</u> <u>Riggins v. Goodman</u>, 572 F.3d 1101, 1107 (10th Cir. 2009).

1. **Procedural Approach to Qualified Immunity.**

The Supreme Court recently revisited the proper procedure for lower courts to evaluate a

qualified immunity defense. In <u>Pearson v. Callahan</u>, the Supreme Court held that lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." 555 U.S. at 236. The Supreme Court also noted that, while no longer mandatory, <u>Saucier v. Katz</u>' protocol -- by which a court first decides if the defendant's actions violated the Constitution, and then the court determines if the right violated was clearly established -- will often be beneficial. <u>See</u> <u>Pearson v. Callahan</u>, 555 U.S. at 241. In rejecting the prior mandatory approach, the Supreme Court recognized that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," and that such an approach burdens district court and courts of appeals with "what may seem to be an essentially academic exercise." 555 U.S. at 237. The Supreme Court also recognized that the prior mandatory approach "departs from the general rule of constitutional avoidance and runs counter to the older, wiser judicial counsel not to pass on questions of constitutionality unless such adjudication is unavoidable." 555 U.S. at 241 (alterations omitted). <u>See</u> <u>Reichle v. Howards</u>, 566 U.S. 658, 664 (2012)(affirming <u>Pearson v. Callahan</u>'s procedure and noting that deciding qualified immunity issues on the basis of a right being not "clearly established" by prior case law "comports with our usual reluctance to decide constitutional questions unnecessarily").

The Supreme Court recognizes seven circumstances where district courts "should address only"[10] the clearly established prong of the qualified immunity analysis: when (i) the first,

---

[10]In <u>Camreta v. Greene</u>, the Supreme Court, somewhat confusingly, states that there are seven circumstances in which the district courts "should address only" the clearly established prong, but, in the same sentence, notes that deciding the violation prong is left "to the discretion of the lower courts." <u>Camreta v. Greene</u>, 563 U.S. at 707. In <u>Kerns v. Bader</u>, the Tenth Circuit

constitutional violation question "is so factbound that the decision provides little guidance for future cases"; (ii) "it appears that the question will soon be decided by a higher court"; (iii) deciding the constitutional question requires "an uncertain interpretation of state law"; (iv) "qualified immunity is asserted at the pleading stage," and "the precise factual basis for the . . . claim . . . may be hard to identify"; (v) tackling the first element "may create a risk of bad decisionmaking," because of inadequate briefing; (vi) discussing both elements risks "bad decisionmaking," because the court is firmly convinced that the law is not clearly established and is thus inclined to give little thought to the existence of the constitutional right; or (vii) the doctrine of "constitutional avoidance" suggests the wisdom of passing on the first constitutional question when "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." Kerns v. Bader, 663 F.3d 1173, 1180-81 (10th Cir. 2011)(quoting Pearson v. Callahan, 555 U.S. at 236-42). Regarding the last of these seven circumstances, the Supreme Court has clarified that courts may "avoid avoidance" and address the first prong before the second prong in cases involving a recurring fact pattern, where guidance on the constitutionality of the challenged conduct is necessary, and the conduct is likely to face challenges only in the qualified immunity context. Camreta v. Greene, 563 U.S. at 706-707. See Kerns v. Bader, 663 F.3d at 1181.[11] "Courts should think carefully before expending

---

interpreted Camreta v. Greene to mean that district courts are restricted from considering the violation prong in seven particular circumstances. See Kerns v. Bader, 663 F.3d 1173, 1180-81 (10th Cir. 2011). The Supreme Court, however, has not stressed the seven circumstances as mandatory. Instead, it has recently reaffirmed only that lower courts "should think hard, and then think hard again before addressing both qualified immunity and the merits of an underlying constitutional claim." District of Columbia v. Wesby, 138 S. Ct. 577, 589 n.7 (2018). This language suggests that the inquiry is still discretionary, although the Court's discretion should be exercised carefully.

[11]In Kerns v. Bader, the Tenth Circuit reversed the Court's decision that an officer was not entitled to qualified immunity, noting that the Court "analyzed both aspects of the qualified

immunity test before agreeing" with the plaintiff that the qualified immunity defense did not protect the officer.  663 F.3d at 1183.  In reversing, the Tenth Circuit stated:

> Because we agree with Sheriff White on the latter (clearly established law) question, we reverse without addressing the former (constitutional violation) question. And we pursue this course because doing so allows us to avoid rendering a decision on important and contentious questions of constitutional law with the attendant needless (entirely avoidable) risk of reaching an improvident decision on these vital questions.

663 F.3d at 1183-84.  The Tenth Circuit did not analyze whether the officer violated the plaintiff's constitutional rights and stated that guidance on the particular constitutional issue would be more appropriate in a case not involving qualified immunity:  "Neither do we doubt that the scope of the Constitution's protection for a patient's hospital records can be adequately decided in future cases where the qualified immunity overlay isn't in play (e.g., through motions to suppress wrongly seized records or claims for injunctive or declaratory relief)."  663 F.3d at 1187 n.5. On remand, the Court stated:

> While the Court must faithfully follow the Tenth Circuit's decisions and opinions, the Court is troubled by this statement and the recent trend of the Supreme Court's hesitancy in § 1983 actions to address constitutional violations.  A Reconstruction Congress, after the Civil War, passed § 1983 to provide a civil remedy for constitutional violations.  See Mitchum v. Foster, 407 U.S. 225, 238-39 (1972).  In Mitchum v. Foster, the Supreme Court explained:
>
>> Section 1983 was originally § 1 of the Civil Rights Act of 1871 . . . and was enacted for the express purpose of "enforc(ing) the Provisions of the Fourteenth Amendment." The predecessor of § 1983 was thus an important part of the basic alteration in our federal system wrought in the Reconstruction era through federal legislation and constitutional amendment.
>
> 407 U.S. at 238-39. Congress did not say it would remedy only violations of "clearly established" law, but that:
>
>> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was

violated or declaratory relief was unavailable.

42 U.S.C. § 1983. The Supreme Court established the qualified immunity defense in Pierson v. Ray, 386 U.S. 547 (1967), and held that officials were not liable for constitutional violations where they reasonably believed that their conduct was constitutional. See E. Clarke, Safford Unified Sch. Dist. No. 1 v. Redding: Why Qualified Immunity is a Poor Fit in Fourth Amendment School Search Cases, 24 B.Y.U. J. Pub. L. 313, 329 (2010). The Supreme Court first introduced the "clearly established" prong in reference to an officer's good faith and held that a compensatory award would only be appropriate if an officer "acted with such an impermissible motivation or with such disregard of the [individual's] clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith." Wood v. Strickland, 420 U.S. 308, 322 (1975). In Harlow v. Fitzgerald, when the Supreme Court moved to an objective test, the clearly established prong became a part of the qualified immunity test. See 457 U.S. at 818 ("We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights."). It seems ironic that the federal courts would restrict a congressionally mandated remedy for constitutional violations -- presumably the rights of innocent people -- and discourage case law development on the civil side -- and restrict case law development to motions to suppress, which reward only the guilty and is a judicially created, rather than legislatively created, remedy. Commentators have noted that, "[o]ver the past three decades, the Supreme Court has drastically limited the availability of remedies for constitutional violations in" exclusionary rule litigation in a criminal case, habeas corpus challenges, and civil litigation under § 1983. J. Marceau, The Fourth Amendment at a Three-Way Stop, 62 Ala. L. Rev. 687, 687 (2011). Some commentators have also encouraged the courts to drop the suppression remedy and the legislature to provide more -- not less -- civil remedies for constitutional violations. See Christopher Slobogin, Why Liberals Should Chuck the Exclusionary Rule, 1999 U. Ill. L. Rev. 363, 390-91 (1999)("Behavioral theory suggests that the exclusionary rule is not very effective in scaring police into behaving. . . . These theories also suggest that a judicially administered damages regime . . . would fare significantly better at changing behavior at an officer level."); Hon. Malcolm R. Wilkey, Constitutional Alternatives to the Exclusionary Rule, 23 S. Tex. L.J. 531, 539 (1982)(criticizing the exclusionary rule and recommending alternatives). In Hudson v. Michigan, 547 U.S. 586 (2006), the Supreme Court noted that civil remedies were a viable alternative to a motion to suppress when it held that the exclusionary rule was inapplicable to cases in which police officers violate the Fourth Amendment when they fail to knock and announce their presence before entering. See 547 U.S. at 596-97. Rather than being a poor or discouraged means of developing constitutional law, § 1983 seems the better and preferable alternative to a motion to suppress. It is

'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'"  Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011)(quoting Pearson v. Callahan, 555 U.S. at 236-37).  See Camreta v. Greene, 563 U.S. at 707 ("In general, courts should think hard, and then think hard again, before turning small cases into large ones.").  The Tenth Circuit will remand a case to the district court for further consideration when the district court has given only cursory treatment to qualified immunity's clearly established prong.  See Kerns v. Bader, 663 F.3d at 1182.

**2.     Clearly Established Rights.**

To determine whether a right was clearly established, a court must consider whether the right was sufficiently clear that a reasonable government employee would understand that what he or she did violated a right.  See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007).  "A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'"  Lobozzo v. Colo. Dep't of Corr., 429 F. App'x. 707, 710 (10th Cir. 2011)(unpublished)(quoting Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983)).

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court

---

interesting that the current Supreme Court and Tenth Circuit appear more willing to suppress evidence and let criminal defendants go free, than have police pay damages for violations of innocent citizens' civil rights.  It is odd that the Supreme Court has not adopted a clearly established prong for suppression claims; it seems strange to punish society for police violating unclear law in criminal cases, but protect municipalities from damages in § 1983 cases.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d 1176, 1224 n.36 (D.N.M. 2012)(Browning, J.), abrogated on other grounds as recognized by Ysasi v. Brown, No. 13-0183, 2014 WL 936835, at *9 n.24 (D.N.M. Feb. 28, 2014)(Browning, J.).  See Richard E. Myers, Fourth Amendment Small Claims Court, 10 Ohio St. J. Crim. L. 571, 590-97 (2013)(arguing that municipalities should establish small-claims courts to adjudicate police officers' Fourth Amendment violations and award monetary judgments).

or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Currier v. Doran, 242 F.3d at 923 (10th Cir. 2001).[12]  "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (alteration in original)(quoting Saucier v. Katz, 533 U.S. at 202).  A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts." Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir. 2004).

The Supreme Court has clarified that qualified immunity's clearly established prong is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 563 U.S. at 741.  "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'"  Reichle v. Howards, 132 S. Ct. at 2093 (quoting Ashcroft v. al-Kidd, 563 U.S. at 741).  "The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." Anderson v. Creighton, 483 U.S. at 639.  "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining

---

[12]The Supreme Court has not yet adopted the standard that a Court of Appeals decision can be a source of clearly established law.  See District of Columbia v. Wesby, 138 S. Ct. at 591 n.8.  It has, however, allowed the standard to remain intact for years without disturbing it.  See, e.g., Reichle v. Howard, 566 U.S. at 665-66.

whether the violative nature of particular conduct is clearly established." Ashcroft v. al-Kidd, 563 U.S. at 742. The level of generality at which the legal rule is defined is important, because qualified immunity shields officers who have "reasonable, but mistaken beliefs" as to the application of law to facts and operates to protect officers from the sometimes "hazy border[s]" of the law. Saucier v. Katz, 533 U.S. at 205.

"[A] case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," but the law is not clearly established where "a distinction might make a constitutional difference." Kerns v. Bader, 663 F.3d at 1188. In Kerns v. Bader, dealing with the search of a home, the Tenth Circuit explained that the relevant question "wasn't whether we all have some general privacy interest in our home," but "whether it was beyond debate in 2005 that the officers' entry and search lacked legal justification." 663 F.3d at 1183 (emphasis added). Furthermore, "general statements of the law are not inherently incapable of giving fair and clear warning." Hope v. Pelzer, 536 U.S. 730, 741 (2002).

Although the Tenth Circuit has recognized a sliding scale for qualified immunity's clearly established inquiry, see Casey v. City of Federal Heights, 509 F.3d 1278, 1284 (10th Cir. 2007)("We have therefore adopted a sliding scale to determine when law is clearly established."), the Tenth Circuit may have since walked back its holding that a sliding-scale is the appropriate analysis. See Aldaba v. Pickens, 844 F.3d 870, 876 (10th Cir. 2016)("Aldaba II"). In Aldaba II, the Tenth Circuit reconsidered its ruling from Aldaba v. Pickens, 777 F.3d 1148 (10th Cir. 2015)("Aldaba I") that officers were entitled to qualified immunity after the Supreme Court vacated its decision in light of Mullenix v. Luna, 136 S. Ct. 305 (2015)(per curiam). In concluding that they had previously erred in Aldaba I, the Tenth Circuit determined:

We erred . . . by relying on excessive-force cases markedly different from this

one. Although we cited <u>Graham</u>, 490 U.S. 386 (1989) to lead off our clearly-established-law discussion, we did not just repeat its general rule and conclude that the officers' conduct had violated it. Instead, we turned to our circuit's sliding-scale approach measuring degrees of egregiousness in affirming the denial of qualified immunity. We also relied on several cases resolving excessive-force claims. But none of those cases remotely involved a situation as here.

<u>Aldaba II</u>, 844 F.3d at 876. The Tenth Circuit further noted that its sliding-scale approach may have fallen out of favor, because the sliding-scale test relies, in part, on <u>Hope v. Pelzer</u>, 536 U.S. at 739-41, and the Supreme Court's most recent qualified immunity decisions do not invoke that case. See <u>Aldaba II</u>, 844 F.3d at 874 n.1. The Tenth Circuit explained:

To show clearly established law, the *Hope* Court did not require earlier cases with "fundamentally similar" facts, noting that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id.* at 741[]. This calls to mind our sliding-scale approach measuring the egregiousness of conduct. *See Morris v. Noe*, 672 F.3d 1185, 1196 (10th Cir. 2012). But the Supreme Court has vacated our opinion here and remanded for us to reconsider our opinion in view of *Mullenix*, which reversed the Fifth Circuit after finding that the cases it relied on were "simply too factually distinct to speak clearly to the specific circumstances here." 136 S. Ct. at 312. We also note that the majority opinion in *Mullenix* does not cite *Hope v. Pelzer*, 536 U.S. 730, [] (2002). As can happen over time, the Supreme Court might be emphasizing different portions of its earlier decisions.

<u>Aldaba II</u>, 844 F.3d at 874 n.1. Since <u>Aldaba II</u>, the Supreme Court has reversed, per curiam, another qualified immunity decision by the Tenth Circuit. See <u>White v. Pauly</u>, 137 S. Ct. 548, 551 (2017)(per curiam). In concluding that police officers were entitled to qualified immunity, the Supreme Court emphasized: "As this Court explained decades ago, the clearly established law must be 'particularized' to the facts of the case." <u>White v. Pauly</u>, 137 S. Ct. at 552. With that principle in mind, the Supreme Court explained that the Tenth Circuit "panel majority misunderstood the 'clearly established' analysis: It failed to identify a case where an officer acting under similar circumstances as Officer White was held to have violated the Fourth Amendment." <u>White v. Pauly</u>, 137 S. Ct. at 552. See <u>District of Columbia v. Wesby</u>, 138 S. Ct.

at 591 ("Tellingly, neither the panel majority nor the partygoers have identified a single precedent -- much less a controlling case or robust consensus of cases -- finding a Fourth Amendment violation under similar circumstances.").  Although the Supreme Court noted that "we have held that [*Tennessee v. ]Garner*[, 471 U.S. 1 (1985)] and *Graham* do not by themselves create clearly established law outside 'an obvious case,'" it concluded "[t]his is not a case where it is obvious that there was a violation of clearly established law under *Garner* and *Graham*."  137 S. Ct. at 552.[13]

---

[13]If a district court in New Mexico is trying -- as it does diligently and faithfully -- to receive and read the unwritten signs of its superior courts, it would appear that the Supreme Court has signaled through its per curiam qualified immunity reversals that a nigh identical case must exist for the law to be clearly established.  As former Tenth Circuit judge, and now Stanford law school professor, Michael McConnell, has noted, much of what lower courts do is read the implicit, unwritten signs that the superior courts send them through their opinions.  See Michael W. McConnell, Address at the Oliver Seth American Inn of Court: How Does the Supreme Court Communicate Its Intentions to the Lower Courts: Holdings, Hints and Missed Signals (Dec. 17, 2014).  Although still stating that there might be an obvious case under Graham that would make the law clearly established without a Supreme Court or Circuit Court case on point, see White v. Pauly, 137 S. Ct. at 552, the Supreme Court has sent unwritten signals to the lower courts that factually identical or a highly similar factual case is required for the law to be clearly established, and the Tenth Circuit is now sending those unwritten signals to the district courts.  See Malone v. Board of County Comm'rs for County of Dona Ana, 2017 WL 3951706, at *3 (10th Cir. Sept. 8, 2017)(unpublished).

Factually identical or highly similar factual cases are not, however, the way the real world works.  Cases differ.  Many cases, such as this one, have so many facts that are unlikely to ever occur again in a significantly similar way.  See York v. City of Las Cruces, 523 F.3d 1205, 1212 (10th Cir. 2008)("However, [the clearly established prong] does not mean that there must be a published case involving identical facts; otherwise we would be required to find qualified immunity wherever we have a new fact pattern.").  Nevertheless, the Supreme Court has crafted their recent qualified immunity jurisprudence to effectively eliminate § 1983 claims by requiring an indistinguishable case and by encouraging courts to go straight to the clearly established prong.  See Saenz v. Lovington Mun. Sch. Dist., 105 F. Supp. 3d 1271, 1297 n.4 (D.N.M. 2015)(Browning, J.).

The Court disagrees with that approach.  The most conservative, principled decision is to minimize the expansion of the judicially created clearly established prong, so that it does not eclipse the congressionally enacted § 1983 remedy.  The judiciary should be true to § 1983 as Congress wrote it.  Moreover, in a day when police shootings and excessive force cases are in the news, there should be a remedy when there is a constitutional violation, and jury trials are the

## LAW REGARDING EXCESSIVE FORCE

An excessive force claim "must . . . be judged by reference to the specific constitutional standard which governs that right, rather than to some generalized 'excessive force' standard." Graham, 490 U.S. at 394. The Supreme Court has long held that all claims of excessive force in the context of an arrest or detention should be analyzed under the Fourth Amendment's reasonableness standard. See Graham, 490 U.S. at 395 ("[A]ll claims that law enforcement officers have used excessive force -- deadly or not -- in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . ."). The Supreme Court recognizes that "police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 397. Consequently, "the reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective." Saucier v. Katz, 533 U.S. 194, 205 (2001).

---

most democratic expression of what police action is reasonable and what action is excessive. If the citizens of New Mexico decided that the Defendants used excessive force, the verdict should stand, not set aside because the parties could not find an indistinguishable Tenth Circuit or Supreme Court decision. Finally, to always decide the clearly established prong first and then to always say that the law is not clearly established could be stunting the development of constitutional law. See Aaron L. Nielson & Christopher J. Walker, The New Qualified Immunity, 89 S. Cal. L. Rev. 1, 6 (2015). And while the Tenth Circuit -- with the exception of now-Justice Gorsuch, see Shannon M. Grammel, Justice Gorsuch on Qualified Immunity, Stan. L. Rev. Online (2017) -- seems to be in agreement with the Court, see, e.g., Casey, 509 F.3d at 1286, the per curiam reversals appear to have the Tenth Circuit stepping lightly around qualified immunity's clearly established prong, see Aldaba II, 844 F.3d at 874; Malone v. Board of County Comm'rs for County of Dona Ana, 2017 WL 3951706, at *3; Brown v. The City of Colorado Springs, 2017 WL 4511355, at *8, and willing to reverse district court's decisions.

1. **Relevant Factors in Determining Whether Officers' Actions Were Objectively Reasonable.**

Graham provides three factors that a court must consider in determining whether an officer's actions were objectively reasonable: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396. See Weigel v. Broad, 544 F.3d 1143, 1151-52 (10th Cir. 2008).

A court assesses "objective reasonableness based on whether the totality of the circumstances justified the use of force, and [must] pay careful attention to the facts and circumstances of the particular case." Estate of Larsen ex. rel Sturdivan v. Murr, 511 F.3d 1255, 1260 (10th Cir. 2008)(internal quotation marks omitted). "The excessive force inquiry evaluates the force used in a given arrest or detention against the force reasonably necessary to effect a lawful arrest or detention under the circumstances of the case." Cortez v. McCauley, 478 F.3d at 1126. "If the plaintiff can prove that the officers used greater force than would have been reasonably necessary to effect a lawful arrest, he is entitled to damages resulting from that excessive force." Cortez v. McCauley, 478 F.3d at 1127. Additionally, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396.

Caselaw need not establish that the exact police procedure at issue is unreasonable for a district court to conclude that it violates the Fourth Amendment. In Weigel v. Broad, two police officers accidentally caused the death of a suspect by using excessive force in arresting and handcuffing him. See 544 F.3d at 1148. The suspect was non-cooperative, disobeying the officers' commands and attempting to flee. See 544 F.3d at 1148. To gain control of the

suspect, one officer tackled him and wrestled him to the ground.  See 544 F.3d at 1148.  The suspect vigorously resisted, repeatedly attempting to take the officers' weapons and evade handcuffing.  See 544 F.3d at 1148.  The officer put the suspect in a choke hold, handcuffed him, laid across his legs, and applied weight to his upper torso.  See 544 F.3d at 1148.  After several minutes, the suspect went into full cardiac arrest and died.  See 544 F.3d at 1149.

The Tenth Circuit held that the district court should not have granted summary judgment for the officers on qualified immunity grounds.  It reasoned that whether the officers' actions were reasonable was a jury question, because there was evidence that a reasonable officer would have known that: (i) the pressure created a risk of asphyxiation; and (ii) the pressure was unnecessary to restrain the suspect.  See 544 F.3d at 1152-53.  Accordingly, a reasonable jury could have concluded that an objectively reasonable officer would not have continued to apply force.  See 544 F.3d at 1149-50.  "If true, this constitutes an unreasonable use of force under the Fourth Amendment."  544 F.3d at 1153 (citing Gutierrez v. City of San Antonio, 139 F.3d 441, 449 (5th Cir. 1998)(concluding that a "material dispute of fact exists as to whether Gutierrez posed a threat of death or serious bodily injury to the officers or to others")).

Similarly, the Tenth Circuit has made clear that, although officers may use force to apprehend a suspect, the level of force they use must be necessary to accomplish their objectives. See Buck v. City of Albuquerque, 549 F.3d 1269, 1289-90 (10th Cir. 2008).  Accordingly, officers may use more force to apprehend a fleeing felon than they may use to arrest a submissive misdemeanant.  See Casey v. City of Federal Heights, 509 F.3d 1278, 1282 (2007)("Casey").  In Buck v. City of Albuquerque, the Tenth Circuit concluded that, when a suspect was charged with only a misdemeanor and was not fleeing, a reasonable jury could find that the officer's acts of grabbing the suspect, dragging him, pushing him face down onto the

pavement, and kneeing him in the back were unreasonable. See 549 F.3d at 1289. Even when a suspect attempted to flee, the Tenth Circuit held that his flight did not justify the officer's kicks in the back and push forward into the pavement. See 549 F.3d at 1190.

The Court has written several times on excessive force. In Smith v. Kenny, 678 F. Supp. 2d 1124 (D.N.M. 2009), the Court concluded that police officers did not use excessive force when they handcuffed two suspects. See 678 F. Supp. 2d at 1165-66. It reasoned that mere "redness and tenderness" to the suspect's wrists, without more evidence of force, "is the kind of de minimis physical injury that does not support an excessive use of force claim." 678 F. Supp. 2d at 1165. In Martin v. City of Albuquerque, 147 F. Supp. 3d 1298 (D.N.M. 2015), the Court declined to grant a police officer's summary judgment motion on an excessive force claim. See 147 F. Supp. 3d at 1330-33. It determined that there was a factual issue whether the police officer struck a drunk driver in the groin or the thigh -- a strike to the thigh might be reasonable, but the groin would be unreasonable. See 147 F. Supp. 3d at 1330-31. The Court also determined that a reasonable jury could conclude that the thigh strike would be unreasonable given that the drunk driver cooperated, albeit belatedly, to the officers commands. See 147 F. Supp. 3d at 1331-32. In so holding, the Court emphasized that the excessive force was all the more apparent, because the police officer "did not inform Martin that he was under arrest before pushing him up against the truck" and executing the thigh or groin strike. 147 F. Supp. 3d at 1332. Finally, the Court determined that "a reasonable jury might find that Padilla's action of pushing Martin face-first into the ground was also unnecessary," because, by the time the officer pushing the man to the ground, because the man's "hands were already covering his groin and he was bent over in pain." 147 F. Supp. 3d at 1333.

## 2.    Least -- or Less -- Forceful Alternatives in Excessive-Force Cases.

"To avoid a 'Monday morning quarterback' approach, the Fourth Amendment does not require the use of the least, or even a less, forceful or intrusive alternative to effect custody, so long as the use of force is reasonable under Graham."    James v. Chavez, 830 F. Supp. 2d 1208, 1236 (D.N.M. 2011)(Browning, J.).    The Fourth Amendment requires only that the defendant officers choose a "reasonable" method to end the threat that the plaintiff poses to the officers in a force situation, regardless of the availability of less intrusive alternatives.    Graham, 490 U.S. at 397.

In Mich. Dep't of State Police v. Sitz, 496 U.S. 444, 450-51 (1990), the Supreme Court examined a case addressing the constitutionality of highway sobriety checkpoints and stated that Brown v. Texas, 443 U.S. 47 (1979),

> was not meant to transfer from politically accountable officials to the courts the decision as to which among reasonable alternative law enforcement techniques should be employed to deal with a serious public danger.  Experts in police science might disagree over which of several methods of apprehending drunken drivers is preferable as an ideal.  But for purposes of Fourth Amendment analysis, the choice among such reasonable alternatives remains with government officials who have a unique understanding of, and a responsibility for, limited public resources, including a finite number of police officers.

Mich. Dep't of State Police v. Sitz, 496 U.S. at 453-54.  See Illinois v. Lafayette, 462 U.S. 640, 647 (1983)("[T]he reasonableness of any particular government activity does not necessarily turn on the existence of alternative 'less intrusive' means.").  To avoid unrealistic second guessing, the Fourth Amendment does not require that an officer use the least-intrusive alternative available to protect himself or others so long as the method chosen is reasonable.

In United States v. Sokolow, 490 U.S. 1 (1989), the Supreme Court examined the stop under Terry v. Ohio, 392 U.S. 1 (1968), of a suspected drug courier in an airport.  See United

States v. Sokolow, 490 U.S. at 3. The Supreme Court rejected Sokolow's contention that the arresting officers were "obligated to use the least intrusive means available to dispel their suspicions that he was smuggling narcotics." 490 U.S. at 11. Instead, the Supreme Court held: "The reasonableness of the officer's decision to stop a suspect does not turn on the availability of less intrusive investigatory techniques. Such a rule would unduly hamper the police's ability to make swift, on-the-spot decisions . . . and require courts to indulge in unrealistic second guessing." United States v. Sokolow, 490 U.S. at 11 (internal quotations and citations omitted). Similarly, in United States v. Sharpe, 470 U.S. 675, 686-87 (1985), the Supreme Court stated that

> a creative judge engaged in post hoc evaluation of police conduct can almost always imagine some alternative means by which the objectives of police might have been accomplished. But "[t]he fact that the protection of the public might, in the abstract, have been accomplished by less intrusive means does not, by itself, render the search unreasonable."

470 U.S. at 686-87 (quoting Cady v. Dombrowski, 413 U.S. 433, 447 (1973)).

In United States v. Melendez-Garcia, 28 F.3d 1046, 1052 (10th Cir. 1994), the Tenth Circuit stated: "We must avoid unrealistic second guessing of police officers' decisions in this regard and thus do not require them to use the least intrusive means in the course of a detention, only a reasonable ones." 28 F.3d at 1052 (internal quotations omitted). See Medina v. Cram, 252 F.3d 1124, 1133 (10th Cir. 2001)(stating that "the reasonableness standard does not require that officers use alternative less intrusive means" (internal quotation marks omitted)); Dickerson v. McClellan, 101 F.3d 1151, 1160 (6th Cir. 1996)("[T]he Fourth Amendment does not require officers to use the best technique available as long as their method is reasonable under the circumstances."); Schulz v. Long, 44 F.3d 643, 649 (8th Cir. 1995)("[T]he Fourth Amendment inquiry focuses not on what the most prudent course of action may have been or whether there

were other alternatives available, but instead whether the seizure actually effectuated falls within the range of conduct which is objectively 'reasonable' under the Fourth Amendment."); Scott v. Henrich, 39 F.3d 912, 915 (9th Cir. 1994)("Requiring officers to find and choose the least intrusive alternative would require them to exercise superhuman judgment. . . . Officers thus need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct we identify as reasonable."); Menuel v. City of Atlanta, 25 F.3d 990, 996-97 (11th Cir. 1994)("[T]he Fourth Amendment does not require officers to use the least intrusive alternatives in search and seizure cases. The only test is whether what the police officers actually did was reasonable."); Plakas v. Drinski, 19 F.3d 1143, 1149 (7th Cir. 1994)("We do not believe the Fourth Amendment requires the use of the least or even a less deadly alternative so long as the use of force is reasonable under Tennessee v. Garner and Graham.").

## LAW REGARDING UNCONSTITUTIONAL IMPRISONMENT

The Tenth Circuit has explained that a plaintiff alleging that the "government has unconstitutionally imprisoned him has at least two potential constitutional claims: 'The initial seizure is governed by the Fourth Amendment, but at some point after arrest, and certainly by the time of trial, constitutional analysis shifts to the Due Process Clause.'" Mondragon v. Thompson, 519 F.3d 1078, 1082 (10th Cir. 2008)(quoting Pierce v. Gilchrist, 359 F.3d 1279, 1285–86 (10th Cir. 2004)). If the plaintiff was imprisoned without legal process, his Fourth Amendment claim is analogous to false arrest or false imprisonment; if he was imprisoned "pursuant to legal but wrongful process, he has a claim under the procedural component of the Fourteenth Amendment's Due Process Clause analogous to a tort claim for malicious prosecution." 519 F.3d at 1082. More recently, the Tenth Circuit has explained that the

Fourteenth Amendment claim analogous to a malicious prosecution claim would not be available if an adequate state remedy exists, but a plaintiff may have the option of bringing a Fourth Amendment claim using a similar malicious prosecution theory. See Myers v. Koopman, 738 F.3d 1190, 1192 (10th Cir. 2013).

In Myers v. Koopman, the plaintiff alleged that a detective fabricated facts to create the illusion of probable cause and, as a result, the plaintiff spent three days in custody. See 738 F.3d at 1192. The plaintiff sued under § 1983 for malicious prosecution, alleging that the detective violated his Fourth and Fourteenth Amendment rights. See 738 F.3d at 1192. The plaintiff brought the Fourteenth Amendment malicious prosecution claim based on the detective's conduct in "conjur[ing] up facts to create the illusion of probable cause for an arrest warrant and subsequent prosecution." 738 F.3d at 1193. The Tenth Circuit explained that "[t]he Fourteenth Amendment protects individuals against deprivations of liberty without due process of law. If a state actor's harmful conduct is unauthorized and thus could not be anticipated pre-deprivation, then an adequate post-deprivation remedy -- such as a state tort claim -- will satisfy due process requirements." 738 F.3d at 1193 (citations omitted). Because a malicious prosecution claim under Colorado law was available, the Tenth Circuit affirmed the district court's dismissal: "The existence of the state remedy flattens the Fourteenth Amendment peg on which [the plaintiff] now tries to hang his § 1983 malicious-prosecution claim." 738 F.3d at 1193. The plaintiff also brought a malicious prosecution claim under the Fourth Amendment; the district court analogized the claim to a false imprisonment claim, but the Tenth Circuit said that the plaintiff was correct in casting his claim as malicious prosecution, "because he was seized after the institution of legal process." 738 F.3d at 1194. The Tenth Circuit described the difference between a § 1983 claim for false imprisonment and malicious prosecution under the Fourth

Amendment:

> What separates the two claims? -- the institution of legal process. Unreasonable seizures imposed without legal process precipitate Fourth Amendment false imprisonment claims. *See Wallace[ v. Kato],* 549 U.S. [384,] 389 [(2007)] (concluding that false imprisonment was the proper analogy where defendants did not have a warrant for the plaintiff's arrest and thus detention occurred without legal process). Unreasonable seizures imposed with legal process precipitate Fourth Amendment malicious-prosecution claims. *See Heck [ v. Humphrey],* 512 U.S. [477,] 484 [ (1994) ] (where detention occurs with legal process the "common-law cause of action for malicious prosecution provides the closest analogy"). Like rain and snow, the claims emanate from the same source, but under different conditions.

738 F.3d at 1194 (footnote omitted). The Tenth Circuit explained that the plaintiff was "arrested pursuant to a validly issued -- if not validly supported -- arrest warrant" and that the plaintiff's suit "challenges the probable-cause determination that generated the legal process." 738 F.3d at 1195.

1.      **Malicious Prosecution.**

The Tenth Circuit "has recognized the viability of malicious prosecution claims under § 1983." Taylor v. Meacham, 82 F.3d 1556, 1560 (10th Cir. 1996). To establish a malicious-prosecution claim under § 1983, a plaintiff must prove that the defendant initiated or continued a proceeding against him without probable cause. See Becker v. Kroll, 494 F.3d 904, 913-14 (10th Cir. 2007). "Unlike a false arrest or false imprisonment claim, malicious prosecution concerns detention only after the institution of legal process." Wilkins v. DeReyes, 528 F.3d 790, 798 (10th Cir. 2008)(internal quotation omitted). "In this context, a Fourth Amendment violation can exist only when a plaintiff alleges the legal process itself to be wrongful." Wilkins v. DeReyes, 528 F.3d at 798.

Under Tenth Circuit case law, a § 1983 malicious prosecution claim includes the following elements: (i) the defendant caused the plaintiff's continued confinement or

prosecution; (ii) the original action terminated the plaintiff's favor; (iii) no probable cause supported the original arrest, continued confinement, or prosecution; (iv) the defendant acted with malice; and (v) the plaintiff sustained damages. See Wilkins v. DeReyes, 528 F.3d at 799. In a Fourth-Amendment malicious-prosecution case, "the third element deals only with the probable cause determination during the institution of legal process." Wilkins v. DeReyes, 528 F.3d at 799.

In Mata v. Anderson, 685 F. Supp. 2d 1223 (D.N.M. 2010)(Browning, J.), the Court determined that the plaintiff lacked a viable malicious prosecution claim, because he had not been unreasonable seized as the Fourth Amendment requires. See 685 F. Supp. 2d at 1278-79. The only deprivation of liberty that the plaintiff alleged was "the necessity of attending his trial" and that he could not leave the county nor enter a liquor store while the charges were pending. 685 F. Supp. 2d at 1278. The Court concluded that those deprivations alone were not "a traditional seizure" recognized under the Fourth Amendment, and that it was "reluctant" to expand the Fourth Amendment's scope to "conditions of pretrial release." 685 F. Supp. 2d at 1278.

### 2. False Arrest and Imprisonment.

The Tenth Circuit has explained that a false arrest or imprisonment claim is appropriate when a person has been imprisoned without legal process. See Mondragon v. Thompson, 519 F.3d at 1082. The claim arises under the Fourth Amendment after an unlawful arrest and before the institution of legal process; the claim accrues when the plaintiff is released or legal process is instituted to justify the imprisonment. See Mondragon v. Thompson, 519 F.3d at 1083. To state a claim for false arrest, a plaintiff must show two elements:

First, the plaintiff must prove that the defendant has deprived him of a right

secured by the "Constitution and laws" of the United States. Second, the plaintiff must show that the defendant deprived him of this constitutional right "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory." This second element requires that the plaintiff show that the defendant acted "under color of law."

Smith v. Plati, 258 F.3d 1167, 1175 (10th Cir. 2001)(quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 150 (1970)).

"To maintain a false arrest or false imprisonment claim under § 1983, [the plaintiff] 'must demonstrate the elements of a common law claim and show that [his] fourth Amendment right to be free from unreasonable search and seizure has been violated.'" Chavez v. Cty. of Bernalillo, 3 F. Supp. 3d 936, 996 (D.N.M. 2014)(Browning J.)(quoting Trimble v. Park Cty. Bd. of Comm'rs, 2000 WL 1773239, at *3 (10th Cir. 2000)(unpublished)). Although constitutional torts are not based on any specific state's tort law, courts generally use the common law of torts as a "starting point" for determining the contours of constitutional violations under § 1983. Pierce v. Gilchrist, 359 F.3d at 1286 (explaining that, although "common law is not limited to the formulation provided by the state in which the tort occurred," the Tenth Circuit has "considered the state law formulation" of false arrest and false imprisonment). Under New Mexico law, false imprisonment is "intentionally confining or restraining another person without his consent and with knowledge that he has no lawful authority to do so." Fuerschbach v. Sw. Airlines Co., 439 F.3d 1197, 1207 (10th Cir. 2006). False arrest occurs when "the facts available to a detaining officer would not warrant a person of reasonable caution to believe detention appropriate." Fuerschbach v. Sw. Airlines Co., 439 F.3d at 1207 (citation omitted).

"A defendant possessed of a good faith and reasonable belief in the lawfulness of the action is not liable for false imprisonment or false arrest." Fuerschbach v. Sw. Airlines Co., 439

F.3d at 1207-08.  To have a "good faith belief," the officer must ordinarily have "probable cause to arrest."  Fuerschbach v. Sw. Airlines Co., 439 F.3d at 1207-08.  Thus, even if a plaintiff can show he was falsely imprisoned, he only "states a claim for false imprisonment in violation of § 1983 by specifically alleging facts that show a government official acted with deliberate or reckless intent to falsely imprison the plaintiff."  Romero v. Fay, 45 F.3d 1472, 1480 (10th Cir. 1995).  "Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law."  Major v. Benton, 647 F.2d 110, 113 (10th Cir. 1981).  "[U]nder state common law . . . the slightest interference with personal liberty is a false imprisonment.  It does not follow that all such invasions however trivial or frivolous serve to activate remedies" under the Constitution of the United States of America.  Wells v. Ward, 470 F.2d 1185, 1187 (10th Cir. 1972).

Defendants in § 1983 cases based on warrantless arrests are entitled to qualified immunity if they had probable cause to arrest the plaintiff.  See Atwater v. Lago Vista, 532 U.S. 318, 322 (2001); Wilder v. Turner, 490 F.3d at 813.  Probable cause therefore serves as a defense to a claim of both false arrest and false imprisonment.  "Probable cause to arrest exists if the facts and circumstances within the officer's knowledge are sufficient to justify a prudent officer [to believe] the defendant committed or is committing an offense."  Wilder v. Turner, 490 F.3d at 813.  See Devenpeck v. Alford, 543 U.S. 146, 152 (2004)("[A] warrantless arrest by a law enforcement officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed.").  "Probable cause only requires a probability of criminal activity, not a *prima facie* showing of such activity."  Wilder v. Turner, 490 F.3d at 813.  See Painter v. City of Albuquerque, 383 F. App'x 795, 798 (10th Cir. 2010)(Gorsuch, J.)(unpublished).  Moreover, because probable cause for a warrantless arrest is

determined at the time the officer made the arrest, "the validity of such an arrest is not undermined by subsequent events in the suspect's criminal prosecution such as dismissal of charges." Wilder v. Turner, 490 F.3d at 813.

<u>**ANALYSIS**</u>

The Court concludes that Wood used excessive force on McGarry and lacked probable cause on the assault charge; Wood did not, however, maliciously prosecute McGarry for resisting, evading, or obstructing a peace officer. Nevertheless, Wood is entitled to qualified immunity on both the excessive force and malicious prosecution claims, because his conduct does not violate a clearly established right. For largely the same reasons, Green and Hightower are also entitled to qualified immunity. McGarry's respondeat superior claim fails, because § 1983 does not give rise to respondeat superior liability. See Monell v. Dep't of Social Servs. of City of N.Y., 436 U.S. 658, 691 (1978)("Monell"). The Court, accordingly, dismisses those three claims. With no other federal claims before it, the Court declines to exercise supplemental jurisdiction and dismisses, without prejudice, the NMTCA claims.

## I. WOOD IS ENTITLED TO QUALIFIED IMMUNITY ON MCGARRY'S EXCESSIVE FORCE CLAIM.

Wood used excessive force. The Court concludes that McGarry shouting and waving his finger at Green and Hightower, while unarmed and in his own home, does not justify Wood grabbing McGarry without warning and wrestling him to the ground. That two other police officers took no action before Wood entered the scene, both of whom were closer to McGarry and had been with McGarry longer, strongly suggest that Wood's actions were unreasonable. That Wood could see that both of those officers had not acted to arrest or grab McGarry as Wood rushed into the home also casts doubt on the reasonableness of Wood's actions. Although the

Court determines that Wood used excessive force, the Court could not locate published Supreme Court or Tenth Circuit decisions that were "particularized to the facts of the case." White v. Pauly, 137 S. Ct. at 552. The Court concludes, therefore, that Wood is entitled to qualified immunity.

### A. A REASONABLE JUROR COULD CONCLUDE THAT WOOD USED EXCESSIVE FORCE.

Whether Wood used excessive force on McGarry is an objective inquiry. See Graham, 490 U.S. at 397. The Court must examine three factors: (i) the severity of the crime at issue; (ii) whether the suspect poses an immediate threat to the safety of officers and others; and (iii) whether he is actively resisting arrest or attempting to evade arrest. See Graham, 490 U.S. at 396. See also Morris v. Noe, 672 F.3d 1185, 1195 (10th Cir. 2012)("Morris"). "Graham establishes that force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest." Casey v. City of Federal Heights, 509 F.3d at 1285. "In an excessive force inquiry," it is not necessary to determine whether probable cause for the arrest exists; instead, "we ask whether the force used would have been reasonably necessary if the arrest or the detention were warranted." Morris, 672 F.3d at 1195. As Morris instructs, when analyzing Graham's first prong, a court must assume that the crime for which the officer believes he has probable cause is valid. See Morris, 672 F.3d at 1195; id. at 1195 n.4 ("On the facts the district court assumed, Defendant did not have probable cause to arrest Morris for any crime. But Cortez and Fogarty indicate we should consider the offense for which the officer thought he had probable cause.")(emphasis in original). Accordingly, the Court considers what crime the law enforcement officer asserts is at issue without analyzing whether he had probable cause for that arrest. See Morris, 672 F.3d at 1195.

Wood asserts that there are two crimes at issue: assaulting a peace officer and resisting, evading, or obstructing an officer. See Motion ¶ 16, at 5. Both crimes are misdemeanors. See N.M. Stat. Ann. § 30-22-21(B); N.M. Stat. Ann. § 30-22-1. Because both are misdemeanors, the level of force justified is typically slight. Morris, 672 F.3d at 1195. In considering Graham's first factor, however, the Tenth Circuit has determined that a "forceful takedown" or "throw down" are "appropriate in arrests or detentions for assault, especially if the officer is trying to prevent an assault." Morris, 672 F.3d at 1195. It emphasized, however, that, under such circumstances, the factor should only weigh "slightly" in the police officer's favor. Morris, 672 F.3d at 1195. Here, Wood grabbed McGarry and eventually forced him to the ground. See Green Video at 36:25-44. There is no uninterrupted visual of Wood's takedown, so it is unclear how forceful Wood was with McGarry in taking him to the ground. See Wood Video 2 at 15:15-24; Green Video at 36:35-44; Hightower Video at 48:50-49:00. Nevertheless, Wood's actions, even if forceful, fall within Morris' ambit, so Graham's first factor weighs slightly in Wood's favor on the assault charge.

The assault charge and the obstructing an officer charge are similar, as both contemplate imminent or occurring physical acts against officers. See Youbyoung Park v. Gaitan, 680 F. App'x 724, 732 (10th Cir. 2017)(unpublished)("In interpreting the phrase '[r]esisting, evading, or obstructing an officer,' New Mexico Courts have emphasized that the statutory phrase envisions 'primarily . . . physical acts of resistance.'")(quoting State v. Wade, 1983-NMCA-084, ¶ 6, 667 P.2d 459, 460)(alterations in Youbyoung Park v. Gaitan). They diverge, however, because a suspect may also resist an officer by refusing to comply with police officers' commands. See State v. Prince, 1999-NMCA-010, ¶ 17, 972 P.2d 859, 863; State v. Diaz, 1995-NMCA-137, ¶ 17, 908 P.2d 258, 262 ("If the jury were persuaded by testimony indicating that

Defendant was intoxicated and defiant of the police . . . the jury could have concluded that . . . Defendant was resisting or abusing the officers in violation of Section 30-22-1(D).").  A throw down for mere defiance would be inappropriate, but forcing the suspect to the ground would be appropriate if that suspect struggled physically against the officer.  It is unclear from the Criminal Complaint what type of resistance for which Wood contends he had probable cause.  See Criminal Complaint at 1.  In its Motion, the Defendants characterize McGarry's resistance as defiance to orders and that it obstructed Wood from helping McGarry's girlfriend with legal paperwork.  See Motion at 18.  Under those circumstances, a throw down would be inappropriate, so Graham's first factor weighs in McGarry's favor on the N.M. Stat. Ann. § 30-22-1(D) charge.[14]

The second factor weighs in McGarry's favor.  Graham's second factor asks whether the suspect poses a threat to an officer.  Graham, 490 U.S. at 396.  "The second Graham factor . . . is undoubtedly the most important and fact intensive factor in determining the objective reasonableness of an officer's use of force."  Pauly v. White, 874 F.3d 1197, 1216 (10th Cir. 2017).

The undisputed facts do not demonstrate that McGarry posed an immediate threat.  McGarry was unarmed.  See Green Video at 0:35:57-0:37:25.  The police officers in the home

_____

[14]Although, on the N.M. Stat. Ann. § 30-22-1(D) charge, the factor might favor McGarry, in excessive force claims, the Court looks to the most serious charge for the underlying actions.  To do so otherwise might produce an absurd result where this factor might weigh in the suspect's favor even if the suspect was charged with murder, so long as the suspect was also charged with a lesser offense, such as battery.  The police officer's force might be reasonable for murder, but not for battery.  The Court concludes that the assault charge is more serious than the N.M. Stat. Ann. § 30-22-1(D) charge, because an assault on a peace office requires either an attempted battery or a reasonable belief that a battery is imminent, whereas a N.M. Stat. Ann. § 30-22-1(D) charge can lie for mere defiance to police orders.  Accordingly, Graham's first factor weighs, slightly, in Wood's favor.

- 44 -

with McGarry outnumbered him two to one. See Green Video at 0:35:57-0:37:25; Hightower Video at 0:048:20-0:50:00. Both were a few feet from McGarry and neither officer had their duty firearms drawn. See Green Video at 0:35:57-0:37:25; Hightower Video at 0:048:20-0:50:00. Although McGarry was yelling and pointing at Green, none of his shouts contained threats; instead, McGarry was telling the officers to get out of his house. See Green Video at 0:35:57-0:37:25. All of those circumstances were visible to Wood as he rushed into the home. See Wood Video 2 at 0:11:53-0:13:19. To be sure, Wood knew that McGarry had choked his girlfriend the prior night, see Wood Aff. ¶¶ 6, 8, at 1-2, but a reasonable officer would have known that McGarry -- a police officer -- was far less likely to attack two armed police officers than his unarmed girlfriend. That Green and Hightower, who were both a few feet from McGarry, had not arrested McGarry before Wood tore into the room, much less put McGarry on the ground, also speaks volumes. Although Wood was aware that McGarry owned a gun, McGarry's hands were empty when Wood entered the home, and Wood had been told that McGarry had no ammunition for the gun. See Wood Video at 13:10-21 (Traci). Moreover, drawing all inferences in the non-moving party's favor, Wood would have heard the content of McGarry's yells, which, as already explained, were not threats. See Green Video at 0:35:57-0:37:25. Taking the facts in the light most favorable to the non-moving party, a reasonable juror could conclude that McGarry posed no immediate threat to Green and Hightower, and he could not have posed a threat to Wood, as Wood had just entered the home. See York v. City of Las Cruces, 523 F.3d 1205, 1208-09, 1211 (10th Cir. 2008)("York")(holding that a "fact finder could easily find constitutional violations" in an excessive force case when a man yelled profanities in public, was "belligerent" towards a cop, and the cop "grab[bed] and handcuff[ed] the suspect before explaining that he [was] under arrest"). Cf. Mata v. City of Farmington, 791 F. Supp. 2d

1118, 1152-53 (D.N.M. 2011)(Browning, J.)(concluding that a man who "engaged in a heated exchange" with a cop and inched his vehicle forward contrary to the cop's command, did not "pose an immediate threat to the safety of the officer").[15]

The third factor -- whether McGarry actively resisted or attempted to evade arrest -- weighs slightly against McGarry. See Graham, 490 U.S. at 396. When Wood first touches McGarry to grab him, McGarry raises his hands and attempts to shove Wood's hands away. See Green Video at 36:15-20. Wood does not announce his presence nor does anyone tell McGarry that he is under arrest. See Green Video at 36:15-20. Although reflexive action to an officer does not amount to resisting arrest, see Becker v. Bateman, 709 F.3d 1019, 1026 (10th Cir. 2013)("Reasonable jurors could infer . . . that Becker's withdrawing of his hand after Officer Bateman attempted to place it in a wrist lock was simply reflexive."); White v. Martin, 425 F. App'x 736, 743 (10th Cir. 2011)(unpublished)("We may infer that Mr. White acted reflexively in response to Trooper Martin's grabbing his wrist and arm."), the Court concludes that McGarry's shove goes beyond mere reflex and amounts to resistance, albeit mild resistance. Within a few seconds however, Wood secures McGarry in a bear-hug-from-behind grab, which McGarry does not appear to struggle against. See Green Video at 36:20-34. The available videos then do not clearly show how the Officers take down and handcuff McGarry. See Wood Video 2 at 15:15-24; Green Video at 36:35-44; Hightower Video at 48:50-49:00. In the clearest video, McGarry

---

[15]The Defendants, in arguing that the force used was reasonable, direct the Court to Gallegos v. City of Colorado Springs, 114 F.3d at 1030-31 ("Gallegos"). See Tr. at 10:4-7 (Martinez). In Gallegos, the Tenth Circuit did not consider an excessive force claim, but, instead, whether officers, who forced a suspect to the ground, "reasonably perceived threat to officer safety" such that a seizure was reasonable. 114 F.3d at 1031. Gallegos' facts diverge from the present case in that the suspect in Gallegos was drunk and had "crouched into a wrestler's position" just before the officers decided to force the suspect to the ground and handcuff him. 114 F.3d at 1031. McGarry, in contrast, had not been drinking and did not assume an attack stance. The Court concludes, therefore, that Gallegos is inapposite.

is partially visible for only a portion of the tape and then he falls out of the frame entirely.  See Green Video at 36:35-44.  The Court can see that, before being handcuffed, McGarry moves his arms against Wood's grasp, which could be interpreted as McGarry struggling against Wood, but a reasonable juror could also interpret McGarry's arm movement as compliance with Wood's command to "give me your hands!"  Green Video at 36:35-44 (Wood).  Thus, the only clear evidence of resistance is McGarry's initial shove, and the Court concludes accordingly, that the third factor weighs, slightly, toward Wood.

With two factors weighing slightly toward Wood and the most important factor tipping toward McGarry, the Court is mindful that the Fourth Amendment's touchstone is reasonableness.  See U.S. Const. amend. IV ("The right of the people to be secure . . . against **unreasonable** searches and seizures, shall not be violated.")(emphasis added).  Here, there were three officers.  Two of them -- Green and Hightower -- apparently concluded that, before Wood entered the home, McGarry need not be tackled or even touched, let alone arrested.  Green and Hightower also happen to be the officers who knew the most about the situation.  Wood, however, who could clearly see that neither Green nor Hightower had made a move on McGarry, see Wood Video 2 at 11:56, decided that McGarry needed to be taken down.  In fact, Green appears to try and call off Wood from engaging with McGarry.  See Hightower Video at 48:34-36 (Green).  The Court concludes that Wood's actions are unreasonable under those circumstances.  Accordingly, a reasonable jury could conclude that Wood used excessive force.

**B.    ALTHOUGH A REASONABLE JUROR COULD CONCLUDE THAT WOOD USED EXCESSIVE FORCE, THE LAW IS NOT CLEARLY ESTABLISHED.**

Although a reasonable juror could conclude that Wood used excessive force, the right is not clearly established, so Wood is entitled to qualified immunity.  "Ordinarily, in order for the

law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Currier v. Doran, 242 F.3d at 923. As the Supreme Court has recently reaffirmed many times "the clearly established law must be 'particularized' to the facts of the case." White v. Pauly, 137 S. Ct. at 552. There must be a Tenth Circuit or Supreme Court decision "close enough on point to make the unlawfulness" of the conduct "apparent." Pauly v. White, 874 F.3d 1197, 1223 (10th Cir. 2017). The Court has concluded that the recent Tenth Circuit and Supreme Court jurisprudence indicates that a case must be highly factually analogous for a Plaintiff to overcome the clearly established prong. See supra at 24-27; Nelson v. City of Albuquerque, __ F. Supp. 3d __, 2017 WL 4776730 at *40 (D.N.M. 2017)(Browning, J.)(collecting Supreme Court decisions reversing Courts of Appeals' qualified immunity decisions on the clearly established prong). See also D.C. v. Wesby, 138 S. Ct. at 590 ("[T]he specificity of the [clearly established] rule is especially important in the Fourth Amendment context."); Mullenix v. Luna, 136 S. Ct. 305, 312 (2015)("[C]ases cited by the Fifth Circuit and respondents are simply too factually distinct to speak clearly to the specific circumstances here."). Just last month, all nine supreme court Justices reversed a United States Court of Appeals for the District of Columbia Circuit decision on qualified immunity's clearly established prong, because "neither the panel majority nor the [plaintiffs] have identified a single precedent -- much less a controlling case or robust consensus of cases -- finding a Fourth Amendment violation under similar circumstances." D.C. v. Wesby, 138 S. Ct. at 591. See id. at 593 (Sotomayor J., concurring)("I agree with the majority that the officers here are entitled to qualified immunity."); id. at 594 (Ginsburg J., concurring)("Given the current state of the Court's precedent, however, I agree that the disposition gained by plaintiffs-respondents was not

warranted by settled law. The defendants-petitioners are therefore sheltered by qualified immunity.").

McGarry has not identified a factually analogous Tenth Circuit or Supreme Court case in his briefing and has conceded that he could find none. See Tr. at 19:21-24 (Witt). The Court has independently researched excessive-force caselaw and believes that York is the closest factually analogous published Tenth Circuit case. 523 F.3d at 1205. In York, a man -- York -- who was driving in a Target parking lot, audibly said "bitch" or, possibly, "what a bitch" when a woman stole a parking lot spot in which he was about to park. See 523 F.3d at 1208. A police officer observed York's outburst, and, seeing that other Target patrons had reacted to York's words, confronted York. See York 523 F.3d at 1208. The two argued. See 523 F.3d at 1208. The police officer called for backup and, after consulting with other law enforcement, determined that there was probable cause to arrest York for disorderly conduct. See 523 F.3d at 1208-09. The police officer then tried to grab York to arrest him, but did not warn York he was under arrest. See 523 F.3d at 1209. York reflexively drew back from the police officer's grab, to which the officer interpreted York as resisting arrest and executed a takedown maneuver. See 523 F.3d at 1209. After successfully taking York to the ground, the police officer pressed a Taser against York's neck and threatened to shock him if York did not untuck his arms from underneath his body so that the officer could handcuff him. See 523 F.3d at 1209. On those facts, the Tenth Circuit, in 2008, concluded that a "fact finder could easily find constitutional violations." 523 F.3d at 1211.

Even so, the Court concludes that there are enough factual differences between York and McGarry's case, such that "the clearly established law" is not "particularized to the facts of the case." White v. Pauly, 137 S. Ct. at 552. For example, the police officer in York threatened

York with a Taser, whereas Wood did not threaten McGarry with one. York was arrested for disorderly conduct whereas McGarry was arrested for assault and resisting, evading, or obstructing an officer. McGarry shouted at the Officers to get out of his home, whereas it is unclear what York said or how loudly he said it to the officer confronting him. It is also unclear how close York was to the officer during his confrontation, but the Court knows that McGarry was just a couple of feet from Green. Because of these factual differences, the Court concludes that the right was not clearly established when Wood grabbed and threw McGarry to the ground, so Wood is entitled to qualified immunity on the excessive force count.[16]

## II. THE OFFICERS ARE ENTITLED TO QUALIFIED IMMUNITY ON THE MALICIOUS PROSECUTION CLAIMS.

To prevail on his malicious prosecution claims, McGarry must demonstrate that the Officers did not have probable cause for the charges brought. Wood brought two charges: assault and resisting, evading or obstructing an officer. See Criminal Complaint at 1. A

---

[16]In so holding, the Court notes that a court can almost always manufacture a factual distinction. For example, here, McGarry was in his kitchen, while York was in a Target parking lot. That kind of factual difference and all of the factual differences listed above should not make a difference in the qualified immunity analysis, but, using Judge -- now Justice -- Gorsuch's test from Kerns v. Bader, they "*might* make a constitutional difference," 663 F.3d at 1187 (emphasis in original), so the Court must conclude that the officer is entitled to qualified immunity. While the Court thinks that a reasonable officer should be able to discern from York that grabbing and throwing an unarmed man to the ground without warning for arguing with a police officer amounts to excessive force, Justice Gorsuch would probably think that the police officer's Taser threat in York is a fact that might make a difference. Even if the Supreme Court is correct that officers should have some notice about what is constitutional and what is not, an almost identical Supreme Court or Tenth Circuit case should not be the test.

"It is a settled and invariable principle, that every right, when withheld, must have a remedy." Marbury v. Madison, 5 U.S. 137, 147 (1803). The Constitution of the United States of America guarantees certain rights. See, e.g., U.S. Const. amend. IV. Congress has provided a remedy. See 42 U.S.C. § 1983. The Supreme Court, with a judicially created qualified-immunity exception, has effectively barred that remedy. That should not be the law. The Court, with reluctance, concludes that York is not factually analogous enough to this case to demonstrate that the right was clearly established.

reasonable juror could conclude that yelling at an officer and pointing at your door does not amount to probable cause for assault. Wood did, however, have probable cause to prosecute McGarry for resisting, evading, or obstructing an officer, because McGarry refused to comply with Green's commands. Although Wood lacks probable cause for the assault charge, he is nonetheless entitled to qualified immunity, as the right was not clearly established.

To the extent that McGarry's malicious prosecution claim includes Green and Hightower, there is no evidence that Green or Hightower prosecuted these charges against McGarry. <u>See</u> Criminal Complaint at 1 (signed only by Wood). Moreover, even if there were evidence that they had prosecuted charges, Green and Hightower are also entitled to qualified immunity for the same reasons that Wood is. Accordingly, summary judgment is appropriate for the Officers on McGarry's malicious prosecution claim.

### A. WOOD HAD PROBABLE CAUSE FOR RESISTING, EVADING OR OBSTRUCTING AN OFFICER, BUT NOT FOR ASSAULT.

McGarry's malicious prosecution claim fails in part, because Wood had probable cause that McGarry resisted, evaded, or obstructed an officer.[17] To prove malicious prosecution a

---

[17]McGarry's malicious prosecution claim is properly considered a malicious prosecution claim and not a false imprisonment claim. <u>See</u> <u>Myers v. Koopman</u>, 738 F.3d at 1194 (concluding that false imprisonment claims lie when unreasonable seizures occur without legal process and malicious prosecution claims lie when unreasonable seizures occur with legal process). The Supreme Court has noted:

> Reflective of the fact that false imprisonment consists of detention without legal process, a false imprisonment ends once the victim becomes held *pursuant to such process* -- when, for example, he is bound over by a magistrate or arraigned on charges. Thereafter, unlawful detention forms part of the damages for the "entirely distinct" tort of malicious prosecution, which remedies detention accompanied, not by absence of legal process, but by *wrongful institution* of legal process

plaintiff must show:

> (1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages.

Stonecipher v. Valles, 759 F.3d 1134, 1146 (10th Cir. 2014). The defendants challenge only the third element and assert that no reasonable juror could conclude that the Officers lacked probable cause to arrest McGarry for assault or for resisting, evading, or obstructing Wood. See Motion at 14.

The Court, thus, begins with the third element -- probable cause. "Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense." Keylon v. City of Albuquerque, 535 F.3d 1210, 1216 (10th Cir. 2008).[18] Under N.M. Stat. Ann. § 30-22-21, an assault upon a peace

---

Wallace v. Kato, 549 U.S. 384, 389-90 (2007)(citations omitted)(emphasis in original). McGarry's Complaint alleges that the Defendants maliciously prosecuted him "by bringing false charges," Complaint ¶ 52, at 6, and that the Officers perjured themselves in the police reports and the Criminal Complaint, see Complaint ¶ 53, at 6. See also Criminal Complaint at 1. From those allegations, the Court concludes that McGarry's malicious prosecution claim is premised on McGarry's unlawful detention arising from the Criminal Complaint and not the seizure that occurred at McGarry's home. See also Motion at 14-21 (not disputing that it is a malicious prosecution claim). Accordingly, McGarry's claim is a malicious prosecution claim. See Stonecipher v. Valles, 759 F.3d 1134, 1146-47 (10th Cir. 2014)(noting that a malicious prosecution claim can arise from an officer filing a criminal complaint); Montoya v. City of Albuquerque, 2004 WL 3426436, at *8 (D.N.M. May 10, 2004)(Browning, J.)("The crux of the Plaintiffs' malicious prosecution claim is that the Defendants gave false statements in both their criminal complaints and during the Grand Jury proceedings.").

[18]In this § 1983 action, "[w]hile it is true that state law with respect to arrest is looked to for guidance as to the validity of the arrest since the officers are subject to those local standards, it does not follow that state law governs." Wilder v. Turner, 490 F.3d 810, 814 (10th Cir. 2007). Thus, Tenth Circuit § 1983 precedent binds the Court. Wilder v. Turner, 490 F.3d at 814 ("Nor, perhaps more importantly, are we bound by a state court's interpretation of federal law -- in this

officer consists of:

> (1) an attempt to commit a battery upon the person of a peace officer while he is in the lawful discharge of his duties; or
>
> (2) any unlawful act, threat or menacing conduct which causes a peace officer while he is in the lawful discharge of his duties to reasonably believe that he is in danger of receiving an immediate battery.

N.M. Stat. Ann. § 30-22-21(A). Battery, in turn, is defined as "the unlawful, intentional touching or application of force to the person of another, when done in a rude, insolent, or angry manner." N.M. Stat. Ann. § 30-3-4. The word person means not only the person's body, but "anything intimately connected with [the] person." Clema v. Colombe, 676 F. App'x 801, 805 (10th Cir. 2017)(unpublished)(citing State v. Ortega, 1992-NMCA-003, ¶ 14, 827 P.2d 152, 156)(alteration only in Clema v. Colombe). See also State v. Skippings, 2011-NMSC-021, ¶ 16, 258 P.3d 1008, 1013 (concluding that evidence of a "scuffle," which "possibly escalated into a physical fight" would support a battery conviction). The Tenth Circuit has concluded that "reaching" for a peace officer's "flashlight would cause a reasonable officer to believe there was a substantial probability that [the man] had committed an assault on a peace officer under New Mexico law." Clema v. Colombe, 676 F. App'x at 805. See Niederstadt v. Wolf, 2014 WL 12783115, at *4 (D.N.M. Dec. 2, 2014)(Yarbrough, M.J.)(holding that police officers had probable cause to arrest a man for assault on a peace officer, because the man had "shouted threats at" the police officers, including a threat to kill them, and "advanced towards" them), report adopted, 2015 WL 13667225 (D.N.M. Jan. 6, 2015)(Parker, J.).

Here, McGarry yelled at Green to get out of his house and pointed his finger both at Green and at the door. See Green Video at 0:36:00-0:36:15. Green stood within a few feet of

---

case the Fourth Amendment."). The Court, however, looks to New Mexico caselaw to determine what the underlying state law charges' elements are. See Wilder v. Turner, 490 F.3d at 814.

McGarry.  See Green Video at 0:35:54-0:36:15; Hightower Video at 0:048:10-25.  Neither Green nor Hightower, who was also very close to McGarry, had moved to handcuff or arrest McGarry.  See Green Video at 0:35:54-0:36:15; Hightower Video at 0:048:15-31.  From those facts, a reasonable juror could conclude that Wood's belief -- that a battery on Green was imminent -- was unreasonable.  McGarry's shouts were not threats, but commands to leave his home.  McGarry did not reach out to Green or Hightower, move toward them suddenly, or otherwise indicate intent to strike.  McGarry's only action that suggests an imminent touching is his finger-pointing that alternated between pointing at Green and at the door.  See Green Video at 0:35:54-0:36:15.  A reasonable inference is that McGarry's pointing is a gesture meant to reinforce his command that Green and Hightower leave his house.  In short, yelling and gesturing at a police officer to get out of your house does not amount to probable cause for assault.

The Court is also mindful that Green and Hightower, who had both been with McGarry longer than Wood and were both physically closer to McGarry than Wood, apparently concluded that McGarry's finger-pointing was not an assault.  As already explored above, when Wood entered the home, he saw both Green and Hightower and neither had attempted to arrest McGarry.  That two other officers, who had greater knowledge of the situation, made no move to arrest McGarry, and that Wood saw both of those officers not acting casts considerable doubt on the reasonableness of Wood's belief that a battery was imminent.  Viewing the evidence in the light most favorable to McGarry, the Court determines that a reasonable juror could conclude that Wood lacked probable cause for arresting McGarry on the assault charge.

Wood, however, also charged McGarry with resisting, evading, or obstructing an officer, which occurs when a person "resist[s] or abus[es] any judge, magistrate or peace officer in the lawful discharge of his duties."  N.M. Stat. Ann. § 30-22-1(D).  See Criminal Complaint at 1.

Resist means physical acts of resistance and defiance of lawful police orders. See State v. Diaz, 1995-NMCA-137, ¶ 25, 908 P.2d at 262; State v. Wade, 1983-NMCA-084, ¶ 6, 667 P.2d at 460. See also Youbyoung Park v. Gaitan, 680 F. App'x at 733-34 (noting that the Court of Appeals of New Mexico has defined "resisting" as "a defendant's overt physical act *or* a defendant's refusal to obey *lawful* police commands")(emphasis in original).[19] See also Manzanares v. Higdon, 575 F.3d 1135, 1144-45 (10th Cir. 2009)("An officer . . . would not reasonably believe that Manzanares was resisting or obstructing an officer under New Mexico law . . . Higdon's sole basis for guessing that Manzanares was violating either provision was the pure speculation that Manzanares could have been more cooperative and shared more information.") Abuse, on the other hand, refers to abusive speech, so long as regulation of such speech "does not offend the First and Fourteenth Amendments," and so "covers only speech that can be called fighting words." State v. Wade, 1983-NMCA-084, ¶ 7, 667 P.2d at 460.[20] Fighting words are "those personally abusive epithets which, when addressed to an ordinary citizens, are, as a matter of

---

[19]The Supreme Court of New Mexico has not considered N.M. Stat. Ann. § 30-22-1(D)'s meaning of resist. The Court concludes that it would adhere to State v. Wade's meaning, as the great weight of Court of Appeals of New Mexico decisions follow that definition, as does at least one unpublished Tenth Circuit decision. See e.g., Youbyoung Park v. Gaitan, 680 F. App'x at 733-34; State v. Jimenez, 2017-NMCA-039, ¶ 39, 392 P.3d 668, 682 ("[A] person can violate Subsection (D) [] by avoiding doing something required, including refusing to comply with an officer's orders."); City of Espanola v. Archuleta, 2010 WL 3997984, at *3 (N.M. Ct. App. Feb. 5, 2010)("[R]esisting can include the failure to obey lawful commands from law enforcement officers."); State v. Diaz, 1995-NMCA-137, ¶ 25, 908 P.2d at 262.

[20]The Supreme Court of New Mexico has not considered the meaning of "abuse" in N.M. Stat. Ann. § 30-22-1(D), but the Court concludes that it would follow State v. Wade's definition, as the Supreme Court of New Mexico has, relatively recently, cited State v. Wade's holding with approval. See State v. Correa, 2009-NMSC-051, ¶ 26, 222 P.3d 1, 8 ("However, our Court of Appeals has previously considered similar conduct, and held that "[s]creaming obscenities and yelling 'get the hell out of the house' do not amount to 'fighting' words, particularly when they are addressed to police officers who are supposed to exercise restraint.")(quoting State v. Wade, 1983-NMCA-084, ¶ 7, 667 P.2d at 460).

common knowledge, inherently likely to provoke violent reaction." Virginia v. Black, 538 U.S. 343, 359 (2003). See Cannon v. City and County of Denver, 998 F.2d 867, 873 (10th Cir. 1993)("Fighting words are thus epithets (1) directed at the person of the hearer, (2) inherently likely to cause a violent reaction and (3) playing no role in the expression of ideas.").

Wood did not have probable cause to arrest McGarry on the abuse element of N.M. Stat. Ann. § 30-22-1(D), because McGarry's yells are not "abuse" or fighting words. His exclamations about the gun that "[i]t's right here . . . It's in the fucking box, and you're pointing a gun at me" and his command to "[g]et the fuck out of my house" see Green Video at 35:49-36:04 (McGarry), express ideas, such as the location of the gun and that McGarry wanted the officers to leave, so those utterances are not fighting words, see Klen v. City of Loveland, 661 F.3d 498, 509 (10th Cir. 2011)("Klens' offensive epithets were not fighting words, because they did express ideas -- chiefly that City building department officials were incompetent."). Moreover, none of his words were a "direct personal insult or an invitation to exchange fisticuffs." Klen v. City of Loveland, 661 F.3d at 510. Finally, McGarry's "vulgar or offensive language" alone do not make his "outbursts fighting words." Klen v. City of Loveland, 661 F.3d at 510 ("Words may convey anger and frustration without being likely to provoke a violent reaction."). See State v. Wade, 1983-NMCA-084, ¶ 17, 667 P.2d at 462 ("Screaming obscenities and yelling 'get the hell out of the house' do not amount to fighting words, particularly when they are addressed to police officers, who are supposed to exercise restraint."). Cf. Stone v. Juarez, 2006 WL 1305039, at *12 (D.N.M. April 23, 2006)("'Fuck you' in this situation is protected speech directed at a police officer regardless whether a crowd of people heard it.")(citing Houston v. Hill, 482 U.S. 451, 461 (1987)("[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers.")).

Wood had probable cause, however, to prosecute on the resistance element. McGarry resisted by refusing to comply with Green's repeated lawful commands. See Storey v. Taylor, 696 F.3d 987, 993 n.6 (10th Cir. 2012)("A detention pursuant to [N.M. Stat. Ann. § 30-22-1(D)] is only justified if the order is actually lawful."). Throughout the entire altercation, Green pled with McGarry to be calm. See Green Video 35:19-43; id. at 36:02-15; id. at 36:21-22. More importantly, Green told McGarry not to show him the gun he owned. See Green Video 35:47-49. McGarry disregarded all of those orders.[21] Although defiance to one order to be calm might not support probable cause under N.M. Stat. Ann. § 30-22-1(D), defiance to several commands coupled with McGarry's actions surrounding the gun support probable cause.[22]

### B. THE MALICIOUS PROSECUTION CLAIM FAILS IN ITS ENTIRETY, HOWEVER, BECAUSE THE RIGHT IS NOT CLEARLY ESTABLISHED.

McGarry has not identified a factually analogous Supreme Court or Tenth Circuit case in his briefing on the malicious prosecution claims, and has conceded that he could find none. See Tr. at 19:21-24 (Witt). The Court has independently researched malicious prosecution caselaw and could find no highly factually analogous published Supreme Court or Tenth Circuit decisions. Indeed, there are only a smattering of Tenth Circuit cases construing N.M. Stat. Ann. §§ 30-22-1(D) & 30-22-21, and only a couple of published decisions. See e.g., Storey v. Taylor,

---

[21]Both types of orders were lawful. Neither implicates an unlawful search or seizure, see Storey v. Taylor, 696 F.3d at 993, and police officers routinely order agitated suspects to be calm and to stay away from weapons, see, e.g., Pauly v. White, 874 F.3d at 1216; Aldaba II, 844 F.3d at 876; Hinton v. City of Elwood, 997 F.2d 774, 781 (10th Cir. 1993).

[22]Although Wood would not have known of Green's commands when he rushed into the home, that fact does not matter for the malicious prosecution claim. The claim turns on whether Wood had probable cause to prosecute the N.M. Stat. Ann. § 30-22-21(D) charge. Probable cause to prosecute does not depend on only Wood's knowledge when the incident occurred but the evidence that supports the Criminal Complaint. See Pierce v. Gilchrist, 359 F.3d 1279, 1294 (10th Cir. 2004)(concluding that the "existence probable cause *at the time of the arrest*" is the wrong inquiry for malicious prosecution claims)(emphasis in original).

696 F.3d at 993-94. The Court also looked at Supreme Court and Tenth Circuit decisions construing similar state statutes. None of the published decisions sufficiently resemble these factual circumstances.

In the most factually analogous case it could find the Tenth Circuit considered whether a police officer lacked probable cause, under the Albuquerque City Code's version of N.M. Stat. Ann. § 30-22-1, which, as the Tenth Circuit noted, is nearly identical to the state statute. See Buck v. City of Albuquerque, 549 F.3d 1269, 1282-83 (10th Cir. 2008)("Buck"). In Buck, a police officer arrested a man during an anti-Iraq War protest for chanting "shame" toward a number of police officers and asking one of the officers "why he could not remain on the sidewalk." Buck, 549 F.3d at 1286. The Tenth Circuit concluded, without much explanation, that such actions did not constitute probable cause for an arrest based on either resisting or abusing an officer. Buck, 549 F.3d at 1286. Although both Buck and this case involve a person verbally challenging officers, the two cases are too distinct to meet the qualified immunity threshold. For example, Buck involves a public protest, whereas this case involves a clash in a private home. The level of confrontation between the person in Buck and the officers may also differ from McGarry's case -- it is not clear how vociferous the man's "shame" chant was or how combative his question to the officer was. Such factual distinctions "*might* make a constitutional difference." Kerns v. Bader, 663 F.3d at 1188 (emphasis in original). The Court concludes, accordingly, that the right was not clearly established in 2014, and Wood is entitled to qualified immunity on that claim.[23]

III.  **THE RESPONDEAT SUPERIOR CLAIM FAILS, BECAUSE ENTITIES CANNOT BE LIABLE UNDER § 1983 ON A RESPONDEAT SUPERIOR**

---

[23]As noted, supra at 50, Green and Hightower are also entitled to qualified immunity.

**THEORY.**

McGarry alleges that Lincoln County and the Lincoln County Sheriff's Department are liable for the Officer's actions on a respondeat superior theory.  See Complaint ¶¶ 58-65, at 7-8. Lincoln County and the Lincoln County Sheriff's Department, however, cannot be liable under § 1983 for such a theory.  See Monell, 436 U.S. at 691 ("[A] municipality cannot be held liable under § 1983 on a *respondeat superior* theory).[24]  McGarry concedes that his respondeat superior claim should fail.  See Tr. at 18:11-13 (Witt).  The Court, therefore, dismisses the respondeat superior claim.

## IV.  THE COURT DECLINES TO EXERCISE SUPPLEMENTAL JURISDICTION OVER THE STATE CLAIM AND DISMISSES IT.

The only remaining claim before the Court is McGarry's NMTCA claim.  See Complaint ¶¶ 66-72, at 8.  The Court declines to exercise supplemental jurisdiction over that claim.  See 28 U.S.C. § 1367(c)(3); Carlsbad Technology, Inc. v. HIF Bio, Inc., 556 U.S. 635, 639 (2009)("A district court's decision whether to exercise that jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary."); United States v. Botefuhr, 309 F.3d 1263, 1273 (10th Cir. 2002)(concluding that if a district court has not already spent a good deal of time and energy on a state law claim, that it "should normally dismiss supplemental state law claims after all of the federal claims have been dismissed.").  Accordingly, the Court will dismiss that claim without prejudice.

**IT IS ORDERED** that the requests in the Defendants' Motion and Supporting Memorandum for Qualified Immunity and Summary Judgment, filed March 15, 2017 (Doc. 45)

---

[24]A theory under Monell would also fail, as there has been no evidence of a Lincoln County or Lincoln County Sheriff's Department policy or custom that caused the Officers to inflict harm.  See Monell, 436 U.S. at 694.

are granted in part and denied in part.  Plaintiff Sean McGarry's claims for Excessive and Unnecessary Use of Force, Malicious Prosecution, and Respondent Superior in his Complaint for Civil Rights Violations, filed May 26, 2016, (Doc. 1), are dismissed with prejudice.  McGarry's State Tort Claims are dismissed without prejudice.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

S. Doug Jones Witt
The Jones Witt Law Firm
Roswell, New Mexico

      *Attorney for the Plaintiff*

Damian L. Martinez
Holt Mynatt Martinez P.C.
Las Cruces, New Mexico

      *Attorneys for the Defendants*